## Richmond

BRUCE E. BOURGEOIS v. COMMONWEALTH OF VIRGINIA.

September 2, 1976.

Record No. 751161.

Present, All the Justices.

*Robert H. Patterson, Jr.* (*W. Carter Younger; McGuire, Woods & Battle,* on brief), for plaintiff in error.

*Gilbert W. Haith, Assistant Attorney General* (*Andrew P. Miller, Attorney General,* on brief), for defendant in error.

COCHRAN, J., delivered the opinion of the court.

In a jury trial the defendant, Bruce E. Bourgeois, was found guilty of grand larceny, and his punishment was fixed at confinement for two years in the penitentiary. We granted Bourgeois a writ of error, on limited grounds, to the judgment order entered on the jury verdict, to consider his challenges to the sufficiency of the evidence and the admissibility of certain evidence adduced against him.

Bourgeois was charged in two indictments with grand larceny. The Commonwealth proceeded on the theory that Bourgeois had obtained money by false pretenses in violation of Code § 18.1-118 (Repl. Vol. 1960).[1] By bill of particulars the Commonwealth alleged, as to the first indictment, that Bourgeois collected and received $200 from Everett Dandridge as payment for services and thereafter falsely, feloniously and with fraudulent intent caused the Treasurer of Virginia to make payment for the same services. Concerning the second indictment, the Commonwealth made a similar allegation in respect to a specified sum collected by the defendant from Bennett Durham.

At the conclusion of the Commonwealth's evidence, the defendant moved to strike the evidence as to both indictments, and this motion was overruled. The defendant introduced no evidence and renewed his motion to strike, which was granted as to the second indictment but overruled as to the first. After the jury returned a verdict of guilty as charged under the first indictment, the trial court took under advisement but subsequently denied the defendant's motion to set aside the verdict because of insufficient evidence.

The evidence sufficiently established that Bourgeois was president of Revco Tractor-Trailer Training, Inc. (Revco), a corporation which provided instruction for individuals interested in learning how to operate trucks; that the Department of Vocational Rehabilitation of Virginia (DVR), functioning under an agreement whereby it received matching funds from the federal government, made rehabilitative services available to physically, emotionally and mentally disabled and handicapped persons for the purpose of enabling them to adjust

---

[1] Code § 18.1-118 (Repl. Vol. 1960) provided:

"**Obtaining money or signature, etc., by false pretense.**—If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be deemed guilty of larceny thereof; or if he obtain, by any false pretense or token, with such intent, the signature of any person to a writing, the false making whereof would be forgery, he shall be confined in the penitentiary not less than two nor more than ten years."

to their disabilities and return to gainful employment; that Revco was a "vendor" in the DVR nomenclature, in that DVR had contracted with Revco to provide training services for DVR students, or "clients"; and that DVR established the fee rates to be charged by a vendor who, after receiving the required authorization from a DVR counsellor, furnished services to a client.

Robert Brockleshurst, Jr., a Regional Director of DVR, testified to the procedure utilized to pay a vendor for services rendered to a DVR client. A DVR counsellor, cognizant of the fee rates approved by DVR, determined whether the client qualified for particular services. He then arranged with a vendor for the client to receive the appropriate services and authorized payment from DVR funds. After the client received the authorized training the vendor sent to the counsellor a progress report and a bill for services rendered. An invoice was prepared by the counsellor and forwarded to the state comptroller, who issued the check to the vendor. By regulation DVR was required "to make use of any other financial resources" of the client before committing DVR funds.

Brockleshurst testified that in May, 1972, it came to his attention that in certain cases counsellors might not have been following the proper procedure. Ascertaining that Revco was the vendor in some of these cases, Brockleshurst visited the office of the corporation in June, conferred with Bourgeois, whom he knew to be "the administrative head" of the business, and examined the Revco files concerning DVR clients.

On July 20, 1972, Brockleshurst met with Bourgeois and examined a list prepared by Bourgeois showing the amounts paid by the Commonwealth for 76 DVR students trained by Revco. The name of Everett Dandridge was on the list, together with a notation that DVR had paid to Revco the established fee of $795, the amount authorized for his training instruction. Brockleshurst found, from his own investigation, that of 85 DVR students trained by Revco some had personally paid money to Revco, and that Revco had also ultimately received the full amount of tuition charges from DVR. On August 9, 1972, Bourgeois presented a list to Brockleshurst showing such duplicate payments and wrote out and delivered to him a check payable to DVR for the total amount of the overpayment.

Over the defendant's objection, the trial court admitted into evidence as Exhibit 4 that list, identified by Brockleshurst, revealing that duplicate payments for 24 DVR students, including Dandridge, had been received by Revco in the aggregate amount of $5,860. The

amount of the overpayment for Dandridge was $200. Brockleshurst testified that Bourgeois informed him that these students applied to Revco for training, paid certain amounts at that time, and subsequently were referred to DVR, where counsellors authorized payment of the full amount of tuition.

On cross-examination Brokleshurst testified that Bourgeois stated that the discrepancies had arisen "because of problems in his bookkeeping system". The witness conceded that he had reported to his superior that DVR had authorized all the funds which were paid to Revco and that Revco "had followed the authorizations and procedures". Brockleshurst also conceded that DVR had reinstated Revco on the list of approved vendors.

William Creekmur, a former DVR counsellor, testified that he received Dandridge's name from Bourgeois, who was aware of Creekmur's "need for clients" so that "the counsellors would look good, the Department would look good, and it would result in more federal funds" for his unit; that he had used Revco as a vendor; that he had dealt only with Bourgeois at Revco; and that he had prepared the DVR file on Dandridge. Although that file noted an initial interview with Dandridge on April 3, 1972, listed as the referral date, Creekmur admitted that he had never met Dandridge and had acquired all the information about him from Bourgeois. Included in the file was a case plan for Dandridge, which forecast payment of $795 for one unit of training as a truck driver, and a copy of the Revco bill for the full amount of his tuition.

Creekmur further testified that the Revco bill was forwarded to DVR by letter dated May 8, 1972, signed by Bunny Imburg, Bourgeois's secretary. Both the letter and the bill were typed on stationery bearing the printed name of Bourgeois as president of Revco. Typed at the lower left-hand corner of the letter were two sets of initials, separated by a colon, corresponding with those of Bourgeois and Bunny Imburg. Denying any knowledge that Revco had collected money directly from Dandridge, Creekmur insisted that, if he had known of this payment, he would have subtracted it from the authorized tuition payment made by DVR. Creekmur conceded, however, that if he had performed his duty of interviewing Dandridge he would have discovered that this client had already partially paid Revco.

Dandridge testified that he had never heard of DVR; that he read about Revco in the newspaper and applied in person to Bourgeois; that at the first meeting he signed a contract with Revco to obtain instruction costing $795 and paid Bourgeois $200 in cash, for which

he obtained a receipt. The receipt and a copy of the contract, both dated April 6, 1972, and signed by Bourgeois on behalf of Revco, were admitted into evidence. At that time Dandridge learned from Bourgeois that in some cases a student might qualify for financial assistance from the State but that if Dandridge could not obtain such aid, upon completion of the course, Revco would arrange for him to pay the balance in monthly installments.

Bennett Durham, a DVR client whose name also appeared on the list of those who had personally paid to Revco money which was later duplicated by DVR payment, testified that he did not know Bourgeois, but had paid $695 in two payments to Bourgeois's father, whom he identified in court. Consequently, the trial court found the evidence insufficient as a matter of law to connect Bourgeois with the Durham duplicate payment.

Proof that the accused obtained money by false pretenses will sustain an indictment for larceny. *Bateman* v. *Commonwealth*, 205 Va. 595, 600, 139 S.E.2d 102, 106 (1964).

In order to convict one of larceny by false pretenses, however, the Commonwealth must prove four elements of the offense charged: (1) an intent to defraud; (2) an actual fraud; (3) use of false pretenses for the purpose of perpetrating the fraud; and (4) accomplishment of the fraud by means of the false pretenses used for the purpose, that is, the false pretenses to some degree must have induced the owner to part with his property. *Anable* v. *Commonwealth*, 24 Gratt. (65 Va.) 563, 567-68 (1873). *See also Hagy* v. *Commonwealth*, 168 Va. 663, 190 S.E. 144 (1937). Moreover, the false pretense must be a representation as to an existing fact or a past event. *Hubbard* v. *Commonwealth*, 201 Va. 61, 109 S.E.2d 100 (1959).

The Commonwealth's case against Bourgeois was grounded on the premise that he had requested authorization from Creekmur for the full tuition for Dandridge's training when he had already received from Dandridge a partial tuition payment of $200 on account. On appeal the Commonwealth has taken the position on brief that the Revco bill for $795 constituted the false pretense, although the Commonwealth had conceded at trial, and the trial court had held, that Revco's subsequent billing of DVR for the full tuition of $795 was not a "token" of false pretense within the contemplation of the statute. In argument before us the Assistant Attorney General insisted that the false pretense was the failure to advise the Commonwealth that partial payment had been received, so that the offense could have been committed by a combination of failure to disclose and subsequent

submission of the bill. Reliance solely on the bill was expressly disavowed.

We cannot say that the Commonwealth's evidence, exclusive of Exhibit 4, while obviously weak, is insufficient as a matter of law. In permitting Exhibit 4 to go to the jury, however, the trial court committed error which requires reversal of Bourgeois's conviction.

This exhibit, listing the duplicate payments received by Revco for 24 students, was introduced for the purpose of showing the payment made by Dandridge and to show a common scheme to defraud. The trial court admitted the exhibit and testimony relevant thereto but cautioned the jury that this evidence was admitted "only for the purpose of bearing on the intent of the defendant" in receiving the payments for which he had been indicted.

Where a material element of the crime is the fraudulent intent of the accused both the Commonwealth and the accused are allowed broad scope in introducing evidence with even the slightest tendency to establish or negate such intent. *Page* v. *Commonwealth*, 148 Va. 733, 741-42, 138 S.E. 510, 512 (1927). Thus, where an accused has perpetrated similar frauds and by false representation obtained valuable consideration, evidence of such acts has been held to be admissible as bearing on fradulent intent. *Hubbard* v. *Commonwealth*, *supra*, 201 Va. at 67, 109 S.E. 2d at 105; *Trogdon* v. *Commonwealth*, 31 Gratt. (72 Va.) 862, 870-71 (1878). Introduction of such evidence has been limited to evidence of other crimes which constitute a part of the general scheme of which the crime charged is a part. *See Kirkpatrick* v. *Commonwealth*, 211 Va. 269, 176 S.E.2d 802 (1970); *Walker* v. *Commonwealth*, 1 Leigh (28 Va.) 574 (1829).

In the present case, the Commonwealth failed to establish that Bourgeois had any connection with the duplicate payments listed in Exhibit 4, except for the Dandridge payment. Indeed, no evidence was adduced to identify the recipient of any other payments made by students, except the two made by Bennett Durham. And it was the uncontradicted testimony of Durham that he paid, not Bourgeois, but Bourgeois's father, who was also employed by Revco. Thus, there was no evidence that Bourgeois had knowledge, when full tuition payments were received from DVR funds, that Revco had already obtained the partial payments from the 23 students, other than Dandridge, listed on Exhibit 4.

The Assistant Attorney General urged in oral argument that Bourgeois as president of Revco controlled its funds, was responsible for criminal acts perpetrated by the corporation, and cannot now hide

behind the corporate shield. However, the general rule is that where the crime charged involves guilty knowledge or criminal intent, it is essential to the criminal liability of an officer of a corporation that he actually and personally did the acts which constitute the offense, or that they were done under his direction or with his permission. *State* v. *Thomas*, 123 Wash. 299, 212 P. 253 (1923); Annot., 33 A.L.R. 787 (1924); 19 Am. Jur. 2d *Corporations*, § 1390, at 787 (1965); 50 Am. Jur.2d *Larceny*, § 79, at 249-50 (1970). An officer cannot avoid criminal responsibility for an illegal act on the ground that it was done in his official capacity or through the instrumentality of the corporation which he controls and dominates and which he has employed for that purpose. *State v. Picheco*, 2 Conn. Cir. 584, 203 A.2d 242 (1964). And where the business itself involves a violation of the law all who participate in it are liable. *Crall & Ostrander's Case*, 103 Va. 855, 859, 49 S.E. 638, 640 (1905). See *Carolene Products Co.* v. *United States*, 140 F.2d 61, 65 (4th Cir. 1944).

In *Revell* v. *Commonwealth*, 215 Va. 708, 213 S.E.2d 756 (1975), an embezzlement case, we considered the status of the accused who, one witness testified, "appeared to be the boss" of the business. In the absence of evidence that his position placed him in control of the other employees or funds of the company which received the benefit of the embezzlement, we reversed the accused's conviction.

In the present case, there is evidence that Bourgeois was president of Revco, but there is no evidence that he controlled its employees or funds, or that he was the alter ego of the corporation. As president he alone signed the Revco check to reimburse DVR for the duplicate payments, but the check contained another signature line for the vice-president, permitting the inference that the vice-president also had authority to sign checks for the corporation. There is no evidence as to the extent of Bourgeois's authority, the number of other officers and employees of Revco and their respective duties, or the business procedures of the corporation, from which knowledge of any wrong-doing by other Revco officers or employees might be imputed to Bourgeois. Therefore, the evidence is insufficient to hold Bourgeois criminally responsible as a matter of law for the duplicate payments which Revco received for training the 23 DVR clients. Consequently, the trial court erred in admitting Exhibit 4, without requiring that it be supported by evidence, which was never adduced, that Bourgeois knowingly caused the duplicate payments to be made.

We cannot say that the error was harmless. The Commonwealth relied heavily upon this exhibit, at trial and on appeal, to show fraudu-

lent intent on the part of Bourgeois. It may have contributed significantly to the defendant's conviction.

Accordingly, the judgment of conviction is reversed, and the case is remanded for a new trial.

*Reversed and remanded.*