## Richmond

## DAVID MOSTELLER

## V.

## COMMONWEALTH OF VIRGINIA

June 12, 1981.

Record No. 801223.

Present: All the Justices.

Carl A. Eason (Reid M. Spencer; Wolcott; Spencer, Rivers, Wheary, Basnight & Kelly, P.C., on brief), for appellant.
Thomas D. Bagwell, Assistant Attorney General (Marshall Coleman, Attorney General, on brief), for appellee.

COCHRAN, J., delivered the opinion of the Court.

Tried by the court, sitting without a jury, on indictments charging him with grand larceny from the Commonwealth in violation of Code § 18.2-178,[1] David Mosteller was found guilty on eight separate counts. The court sentenced him to serve a total of 14 years in the penitentiary on six counts and suspended imposition of sentence on two counts for a period of 20 years.

Mosteller was a sales representative for Inter Royal Corporation, a furniture manufacturer. The charges against him arose from a purchase of furniture by the Commonwealth for Southern Virginia Mental Health Institution in Danville and two purchases of furniture for Lynchburg Training School and Hospital in Lynchburg. A separate trial was conducted on the charges arising from each of the three purchases, referred to herein as DANVILLE, LYNCHBURG I and LYNCHBURG II, respectively. On appeal from each conviction, Mosteller contends that, as a matter of law, he could not properly have been found guilty of obtaining money from the Commonwealth by false pretenses in violation of Code § 18.2-178, and that the evidence was insufficient to support his convictions.

## 1. BACKGROUND.

The record shows that Mosteller assisted State personnel at the institutional level to prepare requisitions for the purchase of furniture either manufactured by Inter Royal or of comparable design and quality. Upon approval of these requisitions, the Department of Purchases and Supply of the Commonwealth issued invitations

---

[1] Code § 18.2-178 provides in pertinent part:
If any person obtain, by any false pretense or token, from any person, with intent to defraud, money or other property which may be the subject of larceny, he shall be guilty of larceny thereof; . . . .

to bid to various vendors. To prepare their bids, the vendors obtained from Mosteller quotations of the manufacturer's prices established by Inter Royal and figures for ancillary services such as the installation of the furniture and the furnishing of samples. The vendors then computed their bids by applying their profit markups to the total cost figures. Each bid, as submitted, showed the total amount of the bid and the price per unit. The unit price included the cost of ancillary services and the vendor's profit allocated pro rata to each unit. For each purchase, the Commonwealth issued a certificate showing that it had received the furniture that the successful vendor had contracted to supply.

The Commonwealth's theory was that Mosteller quoted to vendors cost figures that included amounts for fictitious ancillary services purportedly to be supplied by Mosteller and for which he was compensated, thereby improperly inflating the vendors' bids to the detriment of the Commonwealth. Thus, the Commonwealth says, Mosteller obtained money from the Commonwealth by false pretenses.

## 2. APPLICABILITY OF CODE § 18.2-178.

Mosteller argues that, even if the evidence was sufficient to show that he did everything the Commonwealth says he did, his actions would not constitute a violation of Code § 18.2-178. As the Commonwealth received the furniture at the contract price, it got precisely what it freely and voluntarily bargained for. If it accepted in each instance what subsequent analysis revealed to be an inflated bid, the Commonwealth may have been the victim of poor judgment or inferior negotiating skill on the part of its employees, but Mosteller committed no crime in his persuasive salesmanship. Furthermore, Mosteller contends that since he was not in privity with the Commonwealth, he could not properly be convicted for any fraudulent misrepresentations that he may have made to a vendor. Moreover, he acknowledges that his actions may constitute "bid-rigging" under present Code § 59.1-68.7, not in effect at the time of these acts, but says that such manipulating of bids cannot be the basis for the larceny convictions.

We reject these arguments and hold that the Commonwealth could convict him of a violation of Code § 18.2-178 upon proof beyond a reasonable doubt that by his actions Mosteller intended to defraud the Commonwealth, that he made misrepresentations for that purpose, that he in fact did defraud the Common-

wealth, and that the misrepresentations to some degree induced the Commonwealth to pay money that it would not have paid absent the false pretenses. *See Riegert* v. *Commonwealth,* 218 Va. 511, 518, 237 S.E.2d 803, 807 (1977); *Bourgeois* v. *Commonwealth,* 217 Va. 268, 272, 227 S.E.2d 714, 717 (1976).

The victim of the fraudulent scheme need not be the person to whom the false pretense or misrepresentation is made. *See Bolet* v. *United States,* 417 A.2d 386, 393 (D.C. App. 1980); *State* v. *McDonald,* 534 S.W.2d 650, 652-53 (Tenn.), *cert. denied,* 425 U.S. 955, *reh. denied,* 425 U.S. 1000 (1976); *People* v. *Gould,* 246 N.Y.S.2d 758, 765 (1964); *Commonwealth* v. *Kiernan,* 201 N.E. 2d 504, 515 (Mass. 1964), *cert. denied sub nom., Gordon* v. *Massachusetts,* 380 U.S. 913 (1965); *Commonwealth* v. *Johnson,* 181 S.W. 368, 369-370 (Ky. 1916).

It is true, as Mosteller asserts, that the General Assembly has recently enacted two statutes that deal specifically with misrepresentations in commercial transactions with the Commonwealth (Code §§ 18.2-498.1, *et seq.,* Acts 1980, c. 472) and with conspiracies or combinations to "rig" or manipulate bids for sales to the Commonwealth (Code §§ 59.1-68.6, *et seq.,* Acts 1980, c. 471). Nevertheless, the enactment of these statutes does not preclude the Commonwealth from obtaining a conviction under § 18.2-178 if it adduces sufficient evidence. Accordingly, we turn our attention to the evidence to determine whether, viewed in the light most favorable to the Commonwealth, it is sufficient to support Mosteller's several convictions.

### 3. DANVILLE.

In one indictment, Mosteller was charged in three separate counts with grand larceny from the Commonwealth and its agency, Southern Virginia Mental Health Institution, located in Danville. The charges related to alleged misrepresentations in the sale of furniture to the Danville institution as to hardware, installation services, and samples. The trial court convicted Mosteller as

charged and sentenced him to serve two years in the penitentiary on each of the three counts.

### (a) Tamper-proof hardware[2] charges.

■ The requisition forwarded by the Danville facility to the Department of Purchases and Supply specified that the furniture was "to be constructed with tamper proof hardware." The same requirement was included in the form of bid sent to prospective bidders. M. S. Ginn Company, trading as Ginns Southern, was the successful bidder. In preparing its bid, Ginns obtained from Mosteller quotations of unit prices charged by Inter Royal, the manufacturer, for the specified furniture. Mosteller factored in an additional charge of $5,000 for "tamper proofing" to be included in the bid. However, the actual purchase order which Mosteller prepared in his handwriting and forwarded to Inter Royal specified that the furniture was to be manufactured with tamper-proof hardware, "Robinson hardware, if possible". Mosteller sent to Ginns what purported to be, but was not, a copy of the purchase order. This spurious "copy" did not contain the language of the original order requiring that the furniture be manufactured with tamper-proof hardware, and included language not found in the original that Mosteller be advised as to hardware sizes of fastenings.

After Mosteller had placed with Inter Royal the order for tamper-proof hardware, he obtained a commitment from Dadson Enterprises, in Virginia Beach, to "change over" the hardware from standard to tamper-proof for $5,000, the same amount that Mosteller had factored into the unit price figures quoted to Ginns.

The furniture was delivered by Inter Royal to the Danville institution with all of the several hundred pieces except approximately 10 beds containing tamper-proof hardware. There was evidence that Mosteller furnished the tamper-proof hardware for the 10 beds that were not constructed with it, and State employees installed the hardware. Royal Installations, subsequently identified as "Mosteller's company", obtained a letter from officials at the

---

[2] "Tamper-proof hardware", used in certain institutions, consists of screws which cannot be removed with a screwdriver. "Robinson-type" tamper-proof screws have screwdriver slots designed so that the screws cannot be backed out; other types have the slots filled with aluminum putty so a screwdriver cannot be used on them.

institution stating that the "additional installation of tamper proof hardware" had been accomplished.

Ginns received and paid a bill for $5,000 submitted by Dadson Enterprises for tamper-proofing, the accompanying letter stating that "The installation of tamperproof hardware . . . has been completed." In fact, Dadson did not tamper-proof any of the furniture or have any knowledge of what was done in Danville. However, Dadson retained $1,000 for the use of its name and, at Mosteller's request, paid $2,000 to one of his creditors and transferred personal property worth $2,000 to another.

This evidence is sufficient to support the conclusion that Mosteller intended to defraud the Commonwealth by charging double for tamper-proofing, that he misrepresented the facts to Ginns by withholding the information that the furniture was to be manufactured by Inter Royal with tamper-proof hardware, and that he withheld from the Commonwealth information that the double charge was included in the Ginns bid. In providing tamper-proofing for the 10 beds Mosteller, who was Inter Royal's representative, merely acted to discharge the manufacturer's responsibility to deliver tamper-proof furniture as required by the purchase order. Accordingly, Mosteller's conviction under this count will be affirmed.

### (b) Installation charges.

█ Ginns's contract with the Commonwealth required the vendor to uncrate and install the Inter Royal furniture in the Danville facility. Raymond J. Kyber, Vice-President of Operations for Ginns's, testified that when Ginns was responsible for installing furniture, it generally employed others to perform that service. In preparing its successful bid, Ginns obtained from Mosteller, and factored in a quotation of $5,012 for installation services to be performed by Royal Installations. Royal Installations subsequently submitted to Ginns an invoice for $5,012 and received payment in that amount.

Carl L. Phillips, Buildings and Grounds Superintendent at the Danville facility, testified that 90-95% of the Inter Royal furniture was installed by State personnel. Nevertheless, he conceded that Mosteller was there when the furniture was delivered, and that Mosteller and Robert McIntyre, of Royal Installations, assisted with the installation for approximately a day. McIntyre and his

son were present several other times during the installation and rendered assistance to the State workmen.

The record does not show why State personnel installed most of the furniture, when the Commonwealth's contract with Ginns imposed the responsibility for installation upon the vendor. The Danville institution was a new State facility but its maintenance crew had been employed before the new furniture arrived, and this crew was ordered by an official of the facility to unload and install the furniture.

This evidence is insufficient to support Mosteller's conviction under the second count of this indictment. There was factored into Ginns's bid the charge for the furniture installation to be performed by Royal Installations. Mosteller and McIntyre, of Royal Installations, were present and available to do the work. There is no evidence that Royal Installations declined to perform the installation for which it had contracted or that Mosteller made any misrepresentation to Ginns or to the Commonwealth as to the responsibility for installation. Because of these unnecessary and gratuitous services performed by State personnel, Mosteller, acting through Royal Installations, was relieved of most of his contractual obligation to install, and was thereby enabled to derive greater benefit from the job. Through its own actions, the Commonwealth failed to exact of Ginns compliance with its contractual obligations. But this failure does not show either fraudulent intent or false pretense on the part of Mosteller. Accordingly, Mosteller's conviction under this count will be reversed and set aside.

### (c)  Abandoned samples.

■  The invitation to bid contained a provision that the "successful bidder may be required to furnish samples". In his quotations to Ginns for use in preparing its successful bid, Mosteller included an additional charge of $6,113.27 for "abandoned samples", and this item was factored into the aggregate bid of $60,532.59 submitted by Ginns.

Mosteller sent invoices to Ginns for samples. The first invoice called for payment of $7,263, but Mosteller reduced this to $6,113.27 when Ginns reported to him that the larger figure would cause the total cost to Ginns to exceed that originally quoted by Mosteller and thus cause the total sum charged to the Commonwealth to exceed the aggregate amount of the Ginns bid.

One of the later invoices specified that the amount billed was for "abandoned sample furniture utilized" in making the sale. Mosteller received payment of the corrected invoice for $6,113.27.

Kyber signed the bid submitted by Ginns to the Commonwealth. Testifying for the Commonwealth, he explained that it was customary in the furniture industry for manufacturers' representatives to use samples to promote sales. The record shows, however, that when the Ginns bid was accepted, the sale had been successfully brought to contract without the use of samples.

Phillips testified that on one occasion Mosteller asked him to sign a letter verifying that there was sample furniture in the Danville hospital. Phillips refused this request because he knew there had never been any sample furniture of any kind in the facility. J. Wesley Scarce, Purchasing Agent for the hospital, also testified that there were no samples at the institution.

We conclude that the evidence is sufficient to support the trial court's conviction of Mosteller under this count. A reasonable construction of the contract provision is that a successful vendor might be required to leave on the premises samples *used in promoting the sale*. Therefore, it would be proper for a bidder to include in his bid a charge for samples already used to make the sale, which might be left on the premises. In the present case, however, there were no such samples. The trial court could reasonably conclude from the evidence that Mosteller misrepresented to Ginns that he had used samples worth $6,113.27 in promoting the sale, so that Ginns, anticipating that the Commonwealth might require that these samples be left at the hospital, would include this item in its bid. By this misrepresentation, the Commonwealth paid $6,113.27 for nonexistent samples. Mosteller's conviction under this count will be affirmed.

### 4. LYNCHBURG I

In the second trial, Mosteller was charged in two counts with grand larceny from the Commonwealth and its agency, the Lynchburg Training School and Hospital. The charges related to alleged misrepresentations as to installation charges and samples in the sale of furniture for the psychiatric building.

The evidence is that State personnel submitted a requisition for furniture to be installed by State employees, and so informed Mosteller. When the invitation for bids was issued, however, it called for installation to be performed by the vendor, and the suc-

cessful bidder factored in a charge for this service. This change apparently was not made known to the personnel at the institution, and State workers installed the furniture. The trial court, concluding that in view of the Commonwealth's own contract providing for installation by the vendor and payment therefor, the Commonwealth had failed to carry its burden of showing that Mosteller never intended for the vendor to install. Therefore, the court dismissed this count.

The invitation to bid also contained the provision that the "successful bidder may be required to furnish samples". In preparing its successful bid, Contract Interiors, Inc., also referred to as Contract Services, a subsidiary of General Medical Corporation, obtained information from Mosteller as to samples and included in its bid a charge in the amount specified by Mosteller for abandoned samples used to sell the furniture. Thomas Schmidt, an executive of the vendor, testified for the Commonwealth. When asked on cross-examination by Mosteller's counsel whether he knew of the use of samples "far in advance of the bidding process" in order to persuade potential purchasers to buy a particular brand of furniture, Schmidt replied in the affirmative. He testified in reference to the contractual provision for samples that he would have included a charge for this on the basis that "there were samples being furnished, or having been furnished".

A note "from the desk of Dave Mosteller", introduced in evidence, showed a figure of $5,800 for samples used in this transaction. An invoice to the vendor specified $3,000 for "abandoned samples used to sell Psychiatric building furniture at Lynchburg Training School & Hospital". The invoice directed that the check be made payable to "Dave Mosteller — Sample Acct.", and a check in this amount was paid as specified. Nevertheless, the record shows that no samples were used to promote this sale and no samples were ever furnished the hospital or abandoned there.

We conclude that the evidence is sufficient to support the trial court's conviction of Mosteller under this count. A reasonable construction of the contract provision here, as in the Danville case, is that a successful vendor might be required to leave samples previously used in promoting the sale and that he would properly include in his bid the value of such abandoned samples. In this case, however, there were no samples. The trial court could reasonably conclude that Mosteller misrepresented to Contract Services that he had left samples worth $5,800 at the institution in promoting

the sale, that the vendor, because of this misrepresentation, included this figure in its bid, and that the Commonwealth paid $3,000 for nonexistent samples. Mosteller's conviction under this count, therefore, will be affirmed.

## 5. LYNCHBURG II

In the third trial, Mosteller was tried on eight counts, included in four indictments for grand larceny, based upon sales of Inter Royal furniture by four vendors. Each indictment contained one count relating to charges for installation and one for abandoned samples.

The invitation to bid again contained the provision that the "successful bidder may be required to furnish samples". There was no requirement that the vendor install the furniture. The four successful bidders were Contract Services, Ginns, Trend Contract Furnishings (Trend), and Litton Office Products Center (Litton). At the conclusion of the presentation of evidence by the Commonwealth, the trial court, on motion of Mosteller's counsel, in which the Commonwealth concurred, struck the evidence as to the indictment relating to Contract Services.

Each successful bidder included in its bid, as directed by Mosteller, a requirement that contract awards be made "all or nothing Inter-Royal — Split bid between Inter-Royal dealers will be acceptable". This condition was not imposed by Inter Royal.

Also included in the bids was a provision that Inter Royal provide a factory engineer for approximately one week to assist "with any furniture placement per drawings, minor alignment, etc.". Moreover, pursuant to conferences with Mosteller, the Commonwealth included in the invitation to bid specifications for the use of Fiber-X (or comparable substitute), which was a more expensive material than chipcore or particle board often used in manufacturing this type of furniture. At this time Inter Royal had discontinued the use of Fiber-X.

John S. Alexick, Administrative Services Supervisor at the Lynchburg institution, testified that in preparing the requisition for furniture he conferred with Mosteller. He informed Mosteller that, due to financial constraints, State employees would install the furniture, but it was agreed that "a minimum of two factory personnel" would work with the State maintenance crew "throughout the entire assembly". According to Alexick, the furniture was unloaded and placed by State employees but, as Mos-

teller "had arranged", McIntyre and two young men assisted in assembling and installing units. They worked for approximately one day, then departed but returned five or six days later and worked for another day or day and a half. Mosteller made periodic visits after the furniture was delivered, but Alexick did not think these visits were for the purpose of assembling or installing the furniture.

Alexick also testified that there were no samples available for examination prior to the purchase. However, he testified that after the purchase had been "factored and set up", Mosteller called him and offered him "some abandoned samples" from another job at Catawba, North Carolina. These were not items used to sell the furniture purchased for the Lynchburg facility, they were not the type of furniture purchased, and some could not even be used at the Training School. Alexick asserted that Mosteller said that there would be no charge for these samples. Lewis Lankford, a warehouse foreman at the Lynchburg institution, also testified that the only samples received from Mosteller were "some merchandise donated to us" and sent from North Carolina.

Robert S. Maitland, of the Department of Purchases and Supply, testified that Alexick had informed him that installation by the bidders was not desired. Accordingly, Maitland did not include any provision for installation in the invitation to bid.

We turn to the evidence relating to the vendors.

### (a) Litton.

Robert Creasey, a salesman for Litton, testified that Mosteller quoted him figures to use in bidding that included the cost of the furniture and abandoned samples. He identified a memorandum sent to him by Mosteller to explain the figures to be used in bidding. In addition to the Inter Royal cost there was an item marked "Allocable portion for wardrobe labor set up on job $8159.40". Subsequently, Creasey received invoices from Mosteller for $2,159.40 for "Selling costs on abandoned samples" and $6,000 for "Set-up labor for wardrobes".

Raymond Chalkley, also of Litton, testified that he received invoices from Mosteller for $8,159.40 "for services provided at Lynchburg Training School". A check was drawn for this amount but payment was stopped because, among other reasons, he questioned "whether any abandoned samples existed". Mosteller threatened legal action but Chalkley did not pay, except approxi-

mately $2,700 for "some samples . . . sent . . . from Catawba Sanitorium". Chalkley testified that he also received a statement from Mosteller for $6,000 and $8,159.40, or a total of $14,159.40, and that the amount for which he withheld payment, for installation and abandoned samples, was approximately $7,000.

### (b) Trend.

Mosteller's former wife, Barbara Bromley, was president of Trend. She testified that at the time she was quoted prices by Mosteller, she was not aware of any charges other than the cost of the furniture, but later she was billed by Mosteller's company, Royal Installations, for installation and abandoned samples, although "installation was not required" on the job. She was surprised when the Inter Royal invoice was "much lower" than the Inter Royal price quoted by Mosteller. The invoice received from Royal Installations for installation and abandoned samples was $41,000. She requested a breakdown of these charges, and paid Mosteller $25,000 under duress when he threatened her life. Mosteller sued her and her company for the balance of $16,000, but they never were required to pay.

Mrs. Bromley also testified that she had found a copy of Mosteller's analysis sheet showing the actual prices charged by Inter Royal and the amounts quoted by Mosteller to various vendors. It appeared that Mosteller quoted higher cost prices to vendors than he received from Inter Royal, and that he gave different prices to different vendors for the same pieces of furniture.

### (c) Ginns.

It was stipulated that Ginns received from Mosteller an invoice for $1,571.36 for abandoned samples and an invoice for $7,000 for "set-up labor for . . . wardrobes" and paid Mosteller these invoices by two checks.

### (d) Judgment of the trial court.

After the Commonwealth's evidence had been presented, Mosteller moved the court to strike the evidence as to all the indictments. The court denied the motion except as to the indictment based upon purchases from Contract Services. The court merged the two counts into one under the Litton indictment because Mosteller received only one check from Litton, and merged the two

counts into one under the Trend indictment because only one combined bill had been submitted by Mosteller to Trend.

Mosteller presented no evidence. After hearing arguments of counsel, the trial court found him guilty of grand larceny by false pretenses as follows: (1) grand larceny of $2,763.93 under the Litton contract; (2) grand larceny of $25,000 under the Trend contract; (3) grand larceny of $1,571.36 for abandoned samples under the Ginns contract; and (4) grand larceny of $7,000 for set-up labor under the Ginns contract. Subsequently, the court sentenced Mosteller to serve in the penitentiary three years on the Litton conviction and three years on the Trend conviction, and suspended imposition of sentence of 20 years on the two Ginns convictions.

■ The evidence leads to the conclusion that Mosteller was engaged in a deliberate scheme to defraud the Commonwealth. He assisted State personnel to submit requisitions for furniture, he exercised control over the bidders by quoting different prices for the same furniture, and he made certain that Inter Royal got the business by imposing the condition in the bids that Inter Royal would be awarded all or none of the contracts, but that Inter Royal vendors could divide the contracts. This condition, while not necessarily detrimental to the Commonwealth, did exclude one bid, on a portion of the furniture, that was lower than all others.

The vendors were given pre-bid figures by Mosteller for abandoned samples and labor in setting up the furniture. These figures were factored into the successful bids. As to the samples, the trial court could reasonably conclude from the evidence that the vendors were including in their bids what they understood were the values of samples which had already been used to promote the sales and which Mosteller might be required to leave at the institution. This conclusion is strengthened by the suspicion of Litton's executive that there had been no such samples to justify the charge factored into Mosteller's quotations. Mosteller's effort to place unrequested abandoned samples from Catawba Sanitorium in the Lynchburg facility at no charge and his use of this donation to obtain $2,763.93 from Litton for what he represented to be abandoned samples at Lynchburg is further evidence of his scheme. We hold that the evidence is sufficient to support the trial court's convictions of Mosteller for grand larceny of $2,763.93 for nonexistent abandoned samples under the Litton contract and

$1,571.36 for nonexistent abandoned samples under the Ginns contract.

The evidence is not sufficient, however, to support the trial court's convictions of Mosteller for grand larceny for "set-up labor" under the Trend and Ginns contracts. These contracts called for the services of a factory engineer for approximately a week to assist State personnel with placement and minor alignment of furniture. Alexick, who had prepared the requisition for furniture, understood that State personnel would install the furniture but also that two or more factory personnel would work with them in assembling the furniture, and he testified that Mosteller arranged for McIntyre and two other men to assist the State personnel. The Commonwealth could have insisted that the vendors comply precisely with their contractual obligations by providing an engineer from Inter Royal, but the Commonwealth failed to do so and ultimately certified that the contracts had been satisfactorily performed.

It is a reasonable inference that Mosteller factored into his quotations for the successful bids a figure for the services of a factory engineer, that he intended from the beginning to use instead the services of McIntyre, who was employed by Mosteller's company, Royal Installations, and that this substitution was accepted without complaint by the State officials at Lynchburg. Therefore, while the figure of $7,000 for set-up labor under the Ginns contract may have been high, we cannot say that Mosteller perpetrated a fraud upon the Commonwealth in this instance. He sent three men to Lynchburg and they assisted in the placement of the furniture and no one made an issue of the services rendered or the failure to send a factory engineer. Accordingly, we will reverse Mosteller's conviction under this count.

Mosteller factored in $41,000 for labor and abandoned samples in the Trend bid, but there is no evidence as to the amount specified for each category. Moreover, of the $25,000 that he received from Trend, there is no evidence as to the breakdown. All of the $25,000 might have been allocated to labor performed in placing and aligning the furniture. If so, then for the reasons already stated, the charge, while undoubtedly excessive, would not have been fraudulent. Accordingly, we will reverse Mosteller's conviction under this indictment.

## 6. SUMMARY.

It is apparent that in each case Mosteller exploited weaknesses and deficiencies in the Commonwealth's purchasing procedures. There was inadequate communication between State officials at the institutional level and those in the Department of Purchases and Supply in Richmond. There was inadequate supervision of performance under the contracts to require proper compliance by vendors. There was undue reliance upon one manufacturer's representative in obtaining bids from vendors. There was unexplained acquiescence in the inclusion of contractual conditions that favored one or more bidders. While Mosteller's actions were facilitated by the loose control exercised by the Commonwealth, and, as we have demonstrated, in certain instances they constituted merely aggressive business practices, in other instances they resulted in violations of Code § 18.2-178.

We will affirm these convictions of Mosteller:

| Indictment - DANVILLE— | | Count | Sentence |
|---|---|---|---|
| 10-965 | (a) | Tamper-proof hardware | 2 years |
| | (b) | Abandoned samples | 2 years |
| *Indictment - LYNCHBURG I—* | | *Count* | *Sentence* |
| 10-966 | | Abandoned samples | 2 years |
| *Indictment - LYNCHBURG II—* | | *Count* | *Sentence* |
| 10-967 | (a) | Litton contract - Abandoned samples merged count | 3 years |
| 10-969 | (b) | Ginns Contract - Abandoned samples | Imposition of sentence withheld for 20 years |

We will reverse and set aside the following convictions:

| Indictment - DANVILLE— | | Count | Sentence |
|---|---|---|---|
| 10-965 | | Installation | 2 years |
| *Indictment - LYNCHBURG II—* | | *Count* | *Sentence* |
| 10-968 | (a) | Trend contract - Labor and samples | |

| | | | |
|---|---|---|---|
| | | without breakdown merged count | 3 years |
| 10-969 | (b) | Ginns contract - Set-up labor | Imposition of sentence withheld |

*Affirmed in part; reversed in part; and final judgment.*