COURT OF APPEALS OF VIRGINIA

Present:   Judges Benton, Clements and Beales
Argued at Richmond, Virginia


YVONNE BARBARA JACKSON

                                                MEMORANDUM OPINION[*] BY
v.        Record No. 1752-05-2                  JUDGE JAMES W. BENTON, JR.
                                                     DECEMBER 12, 2006

COMMONWEALTH OF VIRGINIA


                 FROM THE CIRCUIT COURT OF HENRICO COUNTY
                          Catherine C. Hammond, Judge

        John W. Luxton for appellant.

        Josephine F. Whalen, Assistant Attorney General (Robert F.
        McDonnell, Attorney General, on brief), for appellee.


        Yvonne Barbara Jackson contends the evidence was insufficient to support her conviction

for obtaining money by false pretenses.  We agree and reverse the conviction.

                                            I.

        The indictment returned by the grand jury charged that Yvonne Barbara Jackson "did

feloniously obtain by false pretenses, money . . . in an amount greater than $200.00 from Linda

Christian-Pierce, in violation of [Code] § 18.2-178."  All the witnesses who testified at the bench

trial did so in the Commonwealth's case-in-chief.

        Christian-Pierce testified she met with Jackson "toward the end of October 2002" at the

home of Paula Cotman, a mutual friend, who knew Christian-Pierce wanted to refinance her home

mortgage.  Christian-Pierce had obtained several home mortgages in the past and wanted to

refinance a mortgage she had obtained a year earlier; however, her credit "wasn't perfect."  She

_____
        [*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

informed Jackson she "wanted some cash out . . . about $10,000" and gave Jackson documents from her previous refinancing to assist Jackson in completing an application. Christian-Pierce testified Jackson discussed compensation at some point during the hour-long meeting.

> Q: . . . [H]ow would she get paid? Did she tell you anything about that?
>
> A: Oh yeah. She, um, explained something about she got paid by some points or something. I couldn't understand what the point system or whatever that was, so I asked her about how much would that be? And she said between about $2,000 to $3,000.
>
> Q: Okay. And did she tell you how you would have to pay her or how she would be paid?
>
> A: Yes, she said that she would get enough, because I told her I didn't have the money, you know, to pay her out front, and she said she would get enough cash out that I could give her, with her pay out of that, out of what I got for cash.

Christian-Pierce testified Jackson said "[t]hat was the fee she charged . . . for doing the paperwork . . . that whole application, that was her job." Christian-Pierce explained, "She stated that . . . was how she got paid, that was the only way she was getting paid to process the loan." She also testified Jackson did not identify a company that would provide the financing and did not say "who she worked for."

Cotman testified she was present when Jackson talked to Christian-Pierce about the loan refinancing. She said Jackson "did not make [any] statement about how she would get paid." Cotman's son and daughter-in-law were also present. Cotman's son explained his recollection of the payment arrangement:

> Q: Okay. Do you remember Ms. Jackson making any comments about how she would be paid for this?
>
> A: She said that . . . Ms. Christian would have to pay her.
>
> Q: Okay. And did she make any relation about why her company wouldn't pay her?

A: No, she did say her company wasn't going to pay her and Ms., Ms. Christian had to pay her.

Cotman's daughter-in-law testified that Jackson said "the company she works for doesn't pay her, so . . . she would have to take the money out of the . . . refund that she's getting back from the . . . refinancing."

A week later, Christian-Pierce delivered additional documents to Jackson and met with her on other occasions about refinancing the loan. During all of these discussions, Jackson never disclosed a name for her employer or the sources she contacted about the loan refinancing. Jackson later contacted Christian-Pierce and told her to go to Challenge Mortgage Company to meet Jericho Cherry and to sign more documents.

Cherry, a branch manager for Challenge Mortgage Company, testified Jackson was not an employee of Challenge Mortgage in October 2002. He said Jackson brought to him documents concerning Christian-Pierce in October or November, and he described the circumstances as follows:

> [Jackson] had left one company and was in process of coming on board with us at Challenge Mortgage. And she had some loans that she had, was working when she was with the other company and needed those loans, and so I agreed to do those loans, . . . while she was in transition coming over to Challenge Mortgage.

Cherry testified Jackson was having a difficult time securing a loan for Christian-Pierce, and he explained this was a "sub-prime" conventional loan which is more difficult to obtain because they are for "people that have credit issues, they . . . don't have credit." When Cherry received the documents from Jackson, he said he would give Jackson "some money," but made no commitment to pay her a pre-determined fee. He testified Jackson's fee would be "based on the fees [his company] collected," but Jackson did not know "what the exact amount would be." Cherry processed the documents, and his company acted as a broker to secure a sub-prime loan for Christian-Pierce from a mortgage lender.

Christian-Pierce went to Challenge Mortgage in November and signed documents necessary to obtain refinancing for her loan. She did not ask Cherry about his fees, and Cherry did not disclose his fees. Later, Jackson informed her the loan had been approved. When Jackson accompanied Christian-Pierce to the title company's office for the loan closing, the closing documents had not been completed. A week later on December 13, Christian-Pierce returned alone to the title company and signed the necessary documents in the presence of an attorney. She received a "H.U.D." statement, which disclosed payments and disbursements connected with the loan refinancing. The statement showed $98,800 as the principal amount of the new loan, and it showed fees paid to Challenge Mortgage, but did not show any fees paid to Jackson. It also showed a disbursement of $12,890.49 to Christian-Pierce. Sometime that same day, Jackson called Christian-Pierce and told her how to deposit Jackson's fee.

Christian-Pierce received the disbursement check three days after the closing. In accordance with Jackson's earlier direction, she went to the bank that issued the disbursement check and obtained two cashier checks payable to herself, one in the amount of $3,430 and the other for the balance. She deposited the $3,430 check into an account Jackson jointly shared with her son. Christian-Pierce testified she made the deposit because "that was the fee [Jackson] charged."

Two weeks after the closing, Cherry paid Jackson $1,053 from Challenge Mortgage's fee. He testified as follows:

> I call it a marketing referral fee because at the time, she was not officially on board with Challenge Mortgage. She was in transition. So it was not actually a commission that was paid directly from Challenge Mortgage. That was the marketing fee.

Cherry explained he could not pay Jackson commissions for the loans she helped facilitate because she was not an employee of Challenge Mortgage. He testified that Jackson and Christian-Pierce lived fifty miles from his office and that he paid Jackson because she "assisted

[him] in collecting information for that loan." In January 2003, Challenge Mortgage Company employed Jackson as an agent to be paid by commission.

At the close of the evidence, the trial judge convicted Jackson of obtaining money by false pretense. She sentenced Jackson to twelve months in jail and suspended eleven months of the sentence.

## II.

Jackson contends the evidence failed to prove she falsely represented a past or existing event when she discussed her fee with Christian-Pierce. The Commonwealth agrees that "[t]he false pretense must be a representation as to an existing fact or past event," but contends Jackson falsely "told Christian-Pierce . . . she would have to pay because her company would not."

Code § 18.2-178 provides in pertinent part, "[i]f any person obtain, by any false pretense or token, from any person, with intent to defraud, money . . . , he shall be deemed guilty of larceny." To sustain a conviction for obtaining money by false pretense, the Commonwealth must prove beyond a reasonable doubt (1) defendant had the intent to defraud; (2) actual fraud occurred; (3) defendant used false pretenses to commit the fraud; and (4) the false pretense caused the owner to part with money. Riegert v. Commonwealth, 218 Va. 511, 518, 237 S.E.2d 803, 807 (1997). The false pretense must be a representation of an existing fact or a past event. Id. Proof of the false pretense "cannot rest upon conjecture or suspicion." Hagy v. Commonwealth, 168 Va. 663, 666, 190 S.E. 144, 145 (1937).

Jackson asserts that the Commonwealth cannot "point to any representations made by Jackson that were false." The Commonwealth argues the evidence provided a sufficient basis from which "a reasonable fact-finder could certainly infer that Jackson falsely represented to Christian-Pierce that she would not be paid unless Christian-Pierce paid her [and] that she knew

the representation to be false when she made it." We hold that the evidence failed to establish beyond a reasonable doubt that Jackson falsely represented those facts or events.

No evidence proved that Jackson identified her employer when she said Christian-Pierce would have to pay for her services. Christian-Pierce testified that, when she made her arrangements with Jackson, Jackson neither identified the company that would provide the financing nor said "who she worked for." Cotman's son testified Jackson "did say her company wasn't going to pay her," and Cotman's daughter-in-law testified Jackson said "whenever she does the refinance, the company she works for doesn't pay her." Even if the trial judge believed this testimony proved Jackson was employed by or worked for a company when this meeting occurred, no evidence identified this company or Jackson's job position when she and Christian-Pierce made the payment agreement "toward the end of October 2002." Simply put, the evidence failed to prove either that Jackson's employer (or the company for whom she "worked") made the type of loan Christian-Pierce sought or that Jackson's assistance to Christian-Pierce was within the scope of her employment. More significant, the evidence failed to prove Jackson's employer (or the company for whom she "worked") would have compensated her for the assistance she rendered Christian-Pierce. Because the evidence was deficient as to these matters, the trial judge would have to speculate to conclude Jackson made a false statement when she said she would not be paid except by Christian-Pierce. Guilt cannot rest upon evidence that only engenders speculation. Bishop v. Commonwealth, 227 Va. 164, 169, 313 S.E.2d 390, 393 (1984).

"It is well settled in Virginia that to justify conviction of a crime, it is not sufficient to create a suspicion or probability of guilt, but the evidence must establish the guilt of an accused beyond a reasonable doubt. It must exclude every reasonable hypothesis except that of guilt." Cameron v. Commonwealth, 211 Va. 108, 110, 175 S.E.2d 275, 276 (1970). "[T]he evidence

must go further than to create a suspicion or probability of guilt." Hagy, 168 Va. at 666, 190 S.E. at 145 (holding the evidence insufficient to prove false representation where surrounding circumstances were suspicious but not conclusive). "The guilt of a party is not to be inferred because the facts are consistent with his guilt, but they must be inconsistent with his innocence." Cameron, 211 Va. at 110-11, 175 S.E.2d at 276 (citations omitted).

Here, the Commonwealth's witnesses support Jackson's argument that she had no expectation of other payment. Jericho Cherry testified Jackson was seeking a lender for Christian-Pierce's refinancing when she contacted him at Challenge Mortgage. Cherry's unimpeached testimony established that, when Jackson approached him in October or November of 2002, she was unemployed. She was not employed by Challenge Mortgage until January 2003 and, therefore, was not employed by Challenge Mortgage when she made her fee arrangement with Christian-Pierce. When she inquired about Cherry's services, she had failed to get the loan refinanced elsewhere. Cherry did not testify Jackson asked to be paid for bringing the loan request to him. He explained that, after Jackson brought the documents to him, he told Jackson he would give her "some money for it," but did not then specify whether it would be $10, $50, or some other amount.

The Commonwealth suggests on brief that "although the record is ambiguous as to when Jackson knew she was going to be paid by Challenge Mortgage, it definitively establishes that she was paid and that at some point in the process she was aware she was going to be paid." The Commonwealth's own evidence established, however, that Jackson's contact with Cherry about this loan did not occur until after she had met with Christian-Pierce and had been unsuccessful in obtaining a loan from other sources. Cherry testified without contradiction he indicated only at that point he would pay Jackson "some amount." No ambiguity exists in this evidence. But even if the evidence was ambiguous, "'where a fact is equally susceptible of two interpretations

- 7 -

one of which is consistent with the innocence of the accused, [the trier of fact] cannot arbitrarily adopt that interpretation which incriminates him.'" Corbett v. Commonwealth, 210 Va. 304, 307, 171 S.E.2d 251, 253 (1969) (citation omitted).

> It can be safely said that in Virginia there is no principle more firmly imbedded in the body of the law, or one that has been more often stated, than the principle that in every criminal case the evidence of the Commonwealth must show, beyond a reasonable doubt, every material fact necessary to establish the offense for which a defendant is being tried.

McGhee v. Commonwealth, 219 Va. 560, 561, 248 S.E.2d 808, 810 (1978).

The law is clear that "the false pretense must be a representation as to an existing fact or past event." Hubbard v. Commonwealth, 201 Va. 61, 66, 109 S.E.2d 100, 104 (1959). The Supreme Court reiterated this principle in Bourgeois v. Commonwealth, 217 Va. 268, 272, 227 S.E.2d 714, 717 (1976), where it reversed a conviction for false pretenses because of an evidentiary error. In that case, the "indictment [charged] that Bourgeois collected and received $200 from Everett Dandridge as payment for services and *thereafter falsely*, feloniously and with fraudulent intent caused the Treasurer of Virginia to make payment for the same services." Id. at 269, 227 S.E.2d at 715 (emphasis added). Noting the Commonwealth's theory was that the defendant had committed the crime by a "combination" of failing to disclose an existing fact and later falsely submitting a bill that did not disclose this fact, id. at 272-73, 227 S.E.2d at 717, the Court remanded for a new trial and ruled "that the Commonwealth's evidence . . . while obviously weak, [was not] insufficient as a matter of law." Id. at 273, 227 S.E.2d at 717-18.

This principle was also evident in Mosteller v. Commonwealth, 222 Va. 143, 279 S.E.2d 380 (1981), where Mosteller obtained money in a "bid-rigging" scheme based on representations about fictitious services, which he had not performed and for which he had been compensated. Id. at 147, 279 S.E.2d at 381. The Supreme Court reversed some of the false pretense convictions that concerned Mosteller's representations about services to be supplied in the

future.  Id. at 158, 279 S.E.2d at 388.  In so doing, the Court noted that proof of excessive fees earned by Mosteller was not sufficient to prove fraud.  Id.

The evidence in this case proved Jackson was not employed by or "working for" Challenge Mortgage when she offered to seek a loan to refinance Christian-Pierce's mortgage.  Moreover, the evidence failed to prove she had an expectation of payment from Challenge Mortgage when she discussed her fee with Christian-Pierce.  "[R]epresentations amounting to mere promises or statements of intention have reference to future events and are not criminal within the statute."  Id.  At best, the ambiguity in the evidence that the Commonwealth relies upon "creates merely a suspicion of guilt."  Dickerson v. City of Richmond, 2 Va. App. 473, 477, 346 S.E.2d 333, 335 (1986).  "A conviction based upon a mere suspicion or probability of guilt, however strong, cannot stand."  Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601-02 (1986).

While the Commonwealth's evidence may have established that Jackson received an excessive fee for her services, it failed to prove a false pretense.  See Mosteller, 222 Va. at 158, 279 S.E.2d at 388.  The evidence proved the loan refinancing was not the standard type.  Christian-Pierce agreed to pay Jackson to assist her and voluntarily paid Jackson three days after closing the transaction.  Two weeks after the closing, Cherry paid Jackson a fee she had not solicited.

In summary, the evidence failed to prove Jackson knew at the time of the agreement that she would be paid by an entity other than Christian-Pierce.  Because the Commonwealth failed to present sufficient evidence to prove beyond a reasonable doubt a false pretense, we reverse the conviction and dismiss the indictment.

Reversed and dismissed.

Beales, J., dissenting.

As I disagree with the majority's conclusion that absolutely no rational trier of fact could have found appellant guilty beyond a reasonable doubt, I cannot concur in the reversal of the trial court's decision. I respectfully dissent from the majority opinion.

Appellant was convicted of obtaining money by false pretenses in violation of Code § 18.2-178(A) ("If any person obtain, by any false pretense or token, from any person, with intent to defraud, money, a gift certificate or other property that may be the subject of larceny, he shall be deemed guilty of larceny thereof . . . ."). To support a conviction under Code § 18.2-178, the Commonwealth must prove: (1) an intent to defraud, (2) actual fraud, (3) use of the false pretenses to perpetrate the fraud, and (4) the false pretense actually induced the victim to relinquish money or property. See Quidley v. Commonwealth, 221 Va. 963, 965, 275 S.E.2d 622, 624 (1981); Riegert v. Commonwealth, 218 Va. 511, 518, 237 S.E.2d 803, 807 (1977). The false representation must regard an existing fact or past circumstance. Hubbard v. Commonwealth, 201 Va. 61, 66, 109 S.E.2d 100, 104 (1959) (discussing the statute recodified as Code § 18.2-178).

Appellant's argument on appeal relates only to the actual fraud element.[1] She claims that she did not lie to Christian-Pierce about her fee arrangement, so no actual fraud occurred. As this argument concerns sufficiency, we must review the evidence in the light most favorable to the Commonwealth. Holley v. Commonwealth, 44 Va. App. 228, 230, 604 S.E.2d 127, 128 (2004). In addition:

---

[1] During oral argument, appellant argued that the evidence did not prove she had an intent to defraud. However, this issue was not presented in her petition for appeal nor in her brief to this panel. This issue was also not argued before the trial court. Therefore, argument related to the intent element was not preserved for us to consider on appeal. See Rules 5A:12, 5A:18, 5A:20.

When considering on appeal the sufficiency of the evidence presented below, we "presume the judgment of the trial court to be correct" and reverse only if the trial court's decision is "plainly wrong or without evidence to support it." Davis v. Commonwealth, 39 Va. App. 96, 99, 570 S.E.2d 875, 876-77 (2002); see also McGee v. Commonwealth, 25 Va. App. 193, 197-98, 487 S.E.2d 259, 261 (1997) (*en banc*). Thus, we do not "substitute our judgment for that of the trier of fact." Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id.

Kelly v. Commonwealth, 41 Va. App. 250, 257-58, 584 S.E.2d 444, 447 (2003) (*en banc*). This Court must let a conviction stand unless no rational fact finder could have concluded the evidence was sufficient to convict an appellant. Seaton v. Commonwealth, 42 Va. App. 739, 746-47, 595 S.E.2d 9, 12-13 (2004).

Appellant makes two points in support of her contention that the evidence was insufficient. First, she claims she had no employer when she explained things to Christian-Pierce, so she was not lying when she said that she would not receive money from her employer. However, the testimony reflects that appellant said *no one* other than Christian-Pierce would pay her. For example, the following exchange occurred during Christian-Pierce's testimony:

Q: That money, why, why were you giving her that money?

A: That was the fee she charged. That was for doing the paperwork, I mean that whole application, that was her job.

Q: Did she make any comments to you as to whether or not she was being paid from the mortgage company?

A: No, she didn't. She, in fact, she stated that, that was how she got paid, that was the *only way* she was getting paid to process the loan.

(Emphasis added.)

Other witnesses testified that appellant told Christian-Pierce "whenever she does the refinance, that the company she works for doesn't pay her, so they would take, that she would have to take the money out of the, you know, the refund that she's getting back from the, um, refinancing." Yolanda Cotman testified that appellant explained to Christian-Pierce that "the company she works for doesn't pay her." Appellant made this statement to Christian-Pierce, as well as previously to Cotman when appellant was helping Cotman with her refinancing. Cotman explained that "[t]he reason why [appellant] got so much from us [was] because the company she was working for wasn't paying her." Whether she was technically employed at the time, and by whom, is not the point. If appellant knew that *anyone* else would also pay her, then she committed fraud.

Appellant was not new to this business. She was leaving one mortgage company to work for another. Given her background, the trier of fact could infer that she knew that a mortgage company would pay her something, whether as a finder's fee or as an employee, for bringing the business to them. Cherry, who testified that his company had "some sort of relationship" with appellant around October or November of 2002, testified that employees usually get a percentage, based on points, of the loans that they close.

Second, appellant claims she did not know that Cherry would pay her when she initially talked to Christian-Pierce, so she was not lying. However, Cherry testified that he "agreed to do those loans" sometime before the closing. He also testified that they talked about the fee he would pay appellant for bringing the loan to his company. Therefore, appellant knew that Cherry would also be paying her when she told Christian-Pierce that she owed her $3,430 and

- 12 -

wrote out the note telling Christian-Pierce how to deposit the money. She did not tell Christian-Pierce that Cherry would also be paying her. She did nothing to correct the misrepresentation that existed, but instead told Christian-Pierce that she owed $3,430 to appellant for her services.

Appellant was secretive about her work for Christian-Pierce. She did not include her fee from Christian-Pierce in the H.U.D. statement, which would have ensured a payment directly to her from the proceeds of the refinancing. Instead of giving the fee to her directly, appellant told Christian-Pierce to get two cashier's checks after she received the check from the closing, take one cashier's check to the bank, and put the money into an account in the name of appellant's son. This evidence suggests appellant was attempting to hide this transaction and expose it to as little scrutiny as possible.

The Virginia Supreme Court long ago defined "criminal false pretense" as "'the false representation of a past or existing fact, whether *by oral or written words or conduct*, which is calculated to deceive, intended to deceive, and does in fact deceive, and by means of which one person obtains value from another without compensation.' 35 C.J.S., False Pretenses, § 1, p. 636." Hubbard, 201 Va. at 66, 109 S.E.2d at 104 (emphasis added). These words and conduct include the failure to inform a victim about facts relevant to payment for services.

For example, in Mosteller v. Commonwealth, 222 Va. 143, 279 S.E.2d 380 (1981), the Virginia Supreme Court reviewed eight counts of larceny by false pretenses, all of which appellant argued were insufficient as a matter of law. The Court affirmed in part and reversed in part, noting "in certain instances [appellant's actions] constituted merely aggressive business practices, in other instances they resulted in violations of Code § 18.2-178." Id. at 159, 279 S.E.2d at 388. The Court, in regards to three counts that alleged double payments, held the evidence was

> sufficient to support the conclusion that Mosteller intended to defraud the Commonwealth by charging double for tamper-proofing, that he misrepresented the facts to Ginns by withholding the information that the furniture was to be manufactured by Inter Royal with tamper-proof hardware, and that he withheld from the Commonwealth information that the double charge was included in the Ginns bid.

Id. at 150, 279 S.E.2d at 383.

Also, in Bourgeois v. Commonwealth, 217 Va. 268, 269, 227 S.E.2d 714, 715 (1976), the Commonwealth alleged the defendant received a partial tuition payment from a client and, thereafter, "caused the Treasurer of Virginia to make [full] payment for the same services." The Virginia Supreme Court reversed and remanded, holding the trial court erroneously admitted an exhibit, which listed twenty-three other purported victims, "without requiring that it be supported by evidence." Id. at 274, 227 S.E.2d at 719. However, and notably, the Court specifically refused to find the Commonwealth's evidence, "exclusive of [the erroneously admitted] [e]xhibit," insufficient as a matter of law. Id. at 273, 227 S.E.2d at 717.

Even if appellant thought she was correct when she first stated that her only payment would come from Christian-Pierce, she soon found out that Cherry was paying her, too. Nevertheless, appellant continued to let her client believe that the payment calculations were still the same as explained during their first meeting. She continued to act as if Christian-Pierce were the only person paying her, even when Christian-Pierce did work for her to reduce her bill and even after the closing. Appellant falsely represented that only Christian-Pierce would pay the fee for the loan services. Essentially, Christian-Pierce believed appellant was working for her, with no other person or company having a claim to appellant's loyalties. When appellant told Christian-Pierce she owed $3,430, appellant knew this amount was more money than Challenge Mortgage received as the origination fee for the loan. By this point, appellant also knew she would receive a separate payment from Cherry. However, she said nothing to Christian-Pierce,

but instead represented to her that she still owed the previously discussed amount, an amount based on Christian-Pierce being the only person who would pay appellant for her work on this loan.

The trial court logically inferred from this evidence that appellant knew she would be paid from another source when she made her representations to Christian-Pierce. Such reasonable inferences by the fact finder are permissible. See Hancock v. Commonwealth, 12 Va. App. 774, 782, 407 S.E.2d 301, 306 (1991) ("The inferences to be drawn from proven facts, so long as they are reasonable, are within the province of the trier of fact.").

Viewing the evidence in the light most favorable to the Commonwealth, as we are required to do on appeal, I cannot conclude that no rational trier of fact could find appellant guilty beyond a reasonable doubt of obtaining money by false pretenses from Christian-Pierce. Therefore, I would affirm the conviction and, thus, must dissent from the majority's opinion.