## CIRCUIT COURT OF FAIRFAX COUNTY

Commonwealth of Virginia, *ex rel.*
Mary Sue Terry, Attorney General

v.

Virginia Telemarketing, Inc., et al.

Case No. (Chancery) 97,125

By JUDGE RICHARD J. JAMBORSKY

April 26, 1989

I carefully considered the testimony and exhibits produced at the *ore tenus* hearings on November 30 and December 1, 1988. In addition, I reviewed the file and pleadings.

I conclude that the Commonwealth is basically entitled to the relief sought in the Amended Bill of Complaint. The Court's Findings of Fact and Conclusions of Law more precisely set forth the Court's position. I propose to enter a Final Order on May 8, 1989, a draft of which is enclosed.

The law is not a static institution. One of its strengths is its ability to adapt to changing conditions. Fraud is fraud, whether committed one on one in 18th Century England, or one on thousands in 20th Century Fairfax County, utilizing telemarketing techniques. Counsel for the Commonwealth has presented a sound, thoughtful legal solution for the problems created by defendants, and I accept it.

May 9, 1989

*Findings of Fact and Conclusions of Law*

This Court makes the following Findings of Fact and Conclusions of Law based on clear, cogent, and convincing evidence presented at the *ore tenus* hearing of November 30 and December 1, 1988.

1. In connection with the solicitation of contributions, Virginia Telemarketing, Inc. ("VTI") led donors to believe that their contributions would send handicapped children and other less fortunate people to see a circus, a magic show, or a country music concert in 1984, 1985, and 1986 in Fairfax and other Northern Virginia areas.

2. VTI worked with a sponsoring civic group like the Chantilly Jaycees or Springfield Kiwanis which rented its name and reputation out to VTI in return for what amounted to 10 to 15% of the total donations received.

3. VTI assigned a project number or numbers to each sponsor for each entertainment event. Some events had two sponsors and thus two project numbers. The projects at issue in this case are summarized in the attached Table No. 1.

4. VTI solicitors would telephone prospective donors. The telephone pitch typically included some representation like this one found in Exhibit 44 (Chantilly Jaycees script): "A $30 donation will send six children to see the show . . . ." Thirty dollars for six children amounts to $5 per child. In fact, VTI did not send a handicapped child to the show for every $5 given.

5. For the September 21, 1985, Chantilly Jaycees show, VTI took in $66,162 from the public. At $5 per child, that is enough to send 13,232 children to the show. VTI gave 500 passes to the Jaycees to distribute. The auditorium for this show seated 630. This excess collection was no mistake. VTI did this again and again in 1984, 1985, and into 1986 in Virginia. In May, 1984, VTI signed an Assurance of Discontinuance in New York State to limit similar practices. Exhibit 60. Although VTI's former office manager testified that she thought the script may have been changed after an August 13, 1985, phone call from the Office of Consumer Affairs, VTI offered no copy or text of any new script as evidence at trial.

Ms. Wieland had no personal knowledge of what the solicitors said on the phone, other than the Exhibit 44 script. Even if the script were changed on August 13, 1985, Exhibit 86 shows that VTI collected at least $52,000 before the alleged change.

6. VTI and its president and owner, Robert J. Duchano, knew they would never be able to send 13,232 children to the Chantilly Jaycees show. Mr. Duchano testified that the problem was that there were just not enough handicapped children in Northern Virginia (Duchano deposition-I at 52)[1]; it was always difficult to get enough people to attend to make the performance look like a success; he was so desperate to get audiences to show up that he would admit any number of people on one pass. *Id.* at 52, 76. And despite these efforts, he has admitted he rarely had more than a hundred handicapped attend any event. *Id.* at 81-82.

7. For the eight shows covered by the Amended Bill of Complaint, VTI collected over $750,000 in charitable donations on representations that donors were helping to send the handicapped and less fortunate to the circus, a magic show, or a concert.

8. Mr. Duchano could not find enough less fortunate or even handicapped to fill the seats. He simply solicited until he ran out of time as the performance date arrived, or until he had called all the phone numbers in the sponsoring civic group's area. He never stopped soliciting because he had raised enough money. *Supra* cite to Duchano deposition-I at 70; Duchano deposition-II at 125-26.

9. For the Manassas Jaycees circus on August 22, 1984, VTI used three different scripts. Exhibit 15. One said, in part, "[T]he standard donation is $20 to help four kids see the circus." The other two stated, "$25 pledge enables five kids to see the circus. $20 pledge . . . four kids . . ." and so on for $15 and $10.

10. For this Manassas Jaycees August 22, 1984, circus, VTI collected $35,049.50. Exhibit 17. At the represented rate of $5 per child, this amount should have sent 7,009

---

[1] The Commonwealth deposed Mr. Duchano on two separate occasions. The first transcript, from March 5, 1987, will be referred to herein as Duchano deposition-I; the second from January 11, 1988, as Duchano deposition-II.

children. Instead, VTI estimates it distributed only 3,000 tickets.

11. For the Handicaps Unlimited magic show originally scheduled for July 13, 1985, VTI used only one script. Exhibit 38. It said, in part, "The standard donation is only $25, This (sic) would sponsor five to see the show . . ."

12. For this Handicaps Unlimited magic show, VTI collected $46,066.46. Exhibit 40. At the represented rate of $25 for five members of Handicaps Unlimited to see the show, this amount should have sent 9,213 members or other "needy people." Instead, VTI estimates it distributed 400 tickets, which admitted only 800 to the performance.

13. For the joint concert of the Springfield Kiwanis and Bailey's Crossroads Kiwanis on April 14, 1984, VTI used scripts which permitted the solicitors to tell donors, if asked, that twenty dollars would sponsor four children; $15, three; and $10, two. Exhibits 11 and 88. In other words, every five dollars would sponsor another child.

14. For this joint April 14, 1984, concert, VTI collected $105,211.70. Exhibits 12 and 34. At five dollars per child, this amount should have sent 21,042 children. VTI accounted for only 453 tickets distributed for the Bailey's Crossroads Kiwanis, and 255 for the Springfield Kiwanis. Exhibits 12 and 90.

15. For the Springfield Kiwanis show on March 24, 1985, VTI used two scripts, one of which stated, in part, "Our standard donation this year is only $25 and this would enable five kids to see the show." Exhibit 32. The other indicated, in answer to questions, that fifteen dollars sent three children and ten dollars, two. Mr. Duchano admitted this was the script. Duchano deposition-II at 38-40.

16. For this March 24, 1985, show, VTI collected $64,489.05. Exhibit 35. At five dollars per child, this amount should have sent 12,818 children. Instead, VTI estimated it distributed only 850 tickets, and only 500 people attended.

17. There was no relationship whatsoever among the amount of money collected, the number of tickets distributed, or the number attending the show for any of the projects described in the Amended Bill of Complaint. For example, in its Project No. 44, VTI collected $134,126.86 for a

December 10, 1984, concert for the Falls Church Police Association, but only 650, at most, attended. Exhibit 29. In its Project No. 65, another performance for the Falls Church Police Association, the capacity at each of two shows was 1,200, for a total capacity of 2,400. Exhibit 57. VTI estimated that a total of 1,560 people attended the two shows. *Id*. VTI collected $195,298.55 for this project. *Id*. As Mr. Duchano said, deposition-I at 53, "I always thought it could be misleading to the public buying tickets when you raise $100,000 and the hall would only hold -- you couldn't get over 500 to a show."

18. Mr. Duchano made both direct and indirect misrepresentations to the public. One example is found in various receipts given donors. A typical receipt says that approximately 33.5% of the donation goes for a youth employment program. Exhibits 43 and 52 (page 5). These youths were the phone solicitors, and they were not all young. At least one was in his sixties. Duchano deposition-I at 122-23, deposition-II at 5-7. Another example is found in the follow up letter which Mr. Duchano wrote on the letterhead of the Falls Church Police Association, Exhibit 52 (pages 4 and 6). It says, in effect, please send us the money you pledged because we have already put your name on a pass so that parents at the various institutions will know that you had a part in their support. Donors names had not been put on any passes. Duchano deposition-I at 127-130.

19. For VTI Project No. 63, a show on September 21, 1985, VTI claimed "Benefit, event and production expense" of $3,877.80. Exhibit 46. This amount was the total of a $377.80 rental fee for the Chantilly High School and a check no. 121 payable from the Chantilly Jaycees Show Fund to International Entertainment in the amount of $3,500.00. The checks are both posted to the same column no. 13 on VTI's ledger sheets, Exhibit 86, Bates Nos. 500,022 and 500,024.

20. International Entertainment, Inc., was a company which Mr. Duchano incorporated to book performers, and, in so doing, to try to make a profit. Duchano deposition-I at 105. It would make a profit by charging VTI or the civic group more than it paid the performers. Mr. Duchano was its president and sole shareholder. Duchano deposition-

I at 103-06; Duchano deposition-II at 73-75, 93. The company had no employees. *Id*. When he finally closed International Entertainment's bank account, he just wrote himself a check for the $500-plus balance. Duchano deposition-II at 76-77.

21. His ledger sheets for the Chantilly Jaycees project show a check payable to International Entertainment in the amount of $3,500. Exhibit 86, Bates No. 500,022, line 20. Yet the bank records of International Entertainment clearly show that this $3,500 check was not deposited into the account of International Entertainment within the next six months, according to Martha Feller, a records custodian and researcher at Dominion Bankshares. Exhibit 92.

22. Mr. Duchano did not deposit the $3,500 into the account of International Entertainment. After the check was written, the International Entertainment balance was drawn down to $48 within four months, mostly by checks payable to VTI. Exhibits 92 and 98. After a May 17, 1985, check to the Hanneford Circus, none of the checks from International Entertainment's account went to a magician or other performer. Exhibits 92 and 98. (The "HUVA" checks were payable to Handicaps Unlimited of Northern Virginia.)

23. Despite an August, 1988, court order to produce all documents reflecting expenses and payments for this Chantilly Jaycees show, Mr. Duchano has produced no documentation, other than the ledger sheets. Exhibit 86. He testified at trial that he paid magician Don Brandon $2,000. He further testified that he did not know what happened to the remaining $1,500 balance of the $3,500 check to International Entertainment, a company which he owned and which had no employees. VTI's contract with the Jaycees permitted him to charge only: (1) 50% of the gross phone room operations, *see* Exhibit 43, § 3(C); and (2) "expenses" for the event, *id*, §§ 3(F) and 3(D) before splitting the balance 60/40 with the Jaycees. Mr. Duchano will be ordered to refund $1,500, based on his admission.

24. Exhibit 43 is the contract which Mr. Duchano personally signed on behalf of VTI with the Chantilly Jaycees. It calls for the net proceeds of the Project No. 63 to be divided with 60% to the Jaycees and 40% to VTI.

25. Exhibit 46 is the final accounting for Project No. 63. It was signed by Mr. Duchano, who has admitted its accuracy, though it is *not* accurate. *See* Respondents' Supplemental Response to Request for Admissions Nos. 8, 9, and 14. Exhibit 46 reflects that the net proceeds were divided 50/50, not 60/40. If the net profit were divided 50/50, each would have received $6,531.19, not $6,801.19 represented by the accounting.

26. Assuming there had been no overcharge for the magician's services, VTI owed the Chantilly Jaycees 60% of $13,062.38 which is $7,837.42.

27. According to VTI's ledger sheets, Exhibit 86, Bates No. 500,025, lines 4 and 5, VTI miscalculated the split of $1,000 on October 21, resulting in VTI's underpaying the Jaycees $100. VTI divided $1,000 into two $500 checks, instead of one of $600 to the Jaycees and one of $400 to VTI.

28. According to the Dominion Bank records for the Chantilly Jaycees Show Fund account, Exhibit 105, Show Fund account check # 136 in the amount of $500 payable to the Jaycees (*see* Exhibit 86, Bates No. 500,025, line 4) never cleared. This $500, less monthly service charges, remained in the account long after the September 21, 1985, show until April, 1986, when Mr. Duchano wrote VTI a check for $492.63 balance to close the account. Exhibits 99 and 109. This money belonged to the Jaycees.

29. The total owed by VTI to the Jaycees thus is the $100 plus the $492.63, or $592.63 total.

30. Mr. Duchano also tried to make a profit out of the 45% to 50% of gross receipts which VTI received for running the phone rooms. Duchano deposition-II at 11.

31. Neither Duchano nor VTI have filed with the Office of Consumer Affairs the final accountings required by § 57-61(a) of the Code for the March 23, 1986, event.

32. VTI's solicitation was, at least in part, that donors would help send handicapped and less fortunate individuals to shows. These representations were likely to induce donors to give. Where solicitors have made false representations which, by their nature, might induce reliance, it will be inferred that the donors were thereby induced to give, and the Commonwealth need not prove that donors, in fact, relied. *See Wilson v. Carpenter*, 91 Va.

183, 190 (1895). Although VTI could have rebutted this inference, it offered no evidence whatsoever to contradict it.

33. Mr. Duchano should be held personally liable for the deceptive acts of his company because he caused it to do the deceptive acts or knowingly approved of the actions. Under *Bourgeois v. Commonwealth*, 217 Va. 268, 227 S.E.2d 714 (1976), he is liable for having used the corporation as his instrumentality to commit these actions. It is not a question of piercing the corporate veil. It is instead a matter of his personal liability -- joint and several with that of VTI -- for his personal actions.

34. This control over VTI is evidenced by his ownership of all the stock and by his holding of the office of president and position as director. Exhibit 2. He compiled and wrote the training manuals for solicitation. Duchano deposition-I at 50. VTI's office manager Iola Wiland was supposed to get the wording of solicitation scripts from Duchano. *Id.* at 58. She had to check with him on all changes in scripts. Though he signed the Assurance with the Attorney General of New York to curb similar abuses in May, 1985, VTI continued the practices thereafter in Virginia.

35. Duchano personally signed the contract with the Greater Chantilly Jaycees, Exhibit No. 43. This was the contract requiring the 60/40 split of the net proceeds, with 60% going to the Jaycees, though VTI instead split the money 50/50, Exhibit No. 46.

36. Duchano wrote checks on the corporate account, taking funds for personal use when there was money to spare. *See, e.g.,* Exhibit 109, the $492.63 check payable to VTI to close the Chantilly Jaycees Show Fund account. He admitted signing this check.

37. Companies which have engaged in deception or fraud should be deprived of the financial gain which they have made in order that all incentive to violate the law be removed. In *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 4 L. Ed. 2d 323, 80 S. Ct. 332 (1960), for example, an action was brought by the Secretary of Labor seeking, among other things, restitution for individual employees, and seeking an injunction against violations of the Fair Labor Standards Act. The District Court had granted an injunction against further discrimination and

ordered reinstatement of some employees but declined to order the employer to reimburse the employees for wages lost as a consequence of the unlawful discharge. The Supreme Court, however, held that the District Court properly could have ordered reimbursement as a part of its inherent equitable powers to give effect to the policy of the Fair Labor Standards Act.

38. Prior to *DeMario*, the Supreme Court had applied this criterion in several instances. *See U.S. v. Moore*, 340 U.S. 616, 95 L. Ed. 482, 71 S. Ct. 524 (1951), *reh. denied*, 341 U.S. 923, 95 L. Ed. 1356, 71 S. Ct. 740; *Porter v. Warner Holding Co.*, 328 U.S. 395, 90 L. Ed. 1332, 66 S. Ct. 1086 (1946), and citations therein. One notable instance was an antitrust case wherein the Court authorized an order of divestiture, although divestiture was not specifically authorized by the Sherman Act. *Schine Chain Theaters, Inc. v. U.S.*, 334 U.S. 110 (1948).

> Like restitution it merely deprives a defendant of the gains from his wrongful conduct. It is an equitable remedy designed . . . to undo what could have been prevented had the defendants not outdistanced the government in their unlawful project. 334 U.S. at 128.

39. In *Porter v. Warner Holding Co.*, 328 U.S. 395, 66 S. Ct. 1086 (1946), the Administrator of the Emergency Price Control Act sued for injunction and restitution of illegally high rents. The Act specifically empowered the courts to grant temporary and permanent injunctions and "other orders." The act was silent on orders for restitution and rent overcharges. The Supreme Court held that an order requiring restitution was proper under each of two separate theories; one, as an equitable adjunct to injunctive relief; and two, as a necessity for the enforcement of the Act. "Future compliance may be more definitely assured if one is compelled to restore one's illegal gains . . . ." 328 U.S. at 400. *See also Deed & Mortgage Exchange v. S.E.C.*, 285 F.2d 162 (9th Cir. 1960), *cert. denied*, 366 U.S. 919 (1960), in which the appointment of a receiver of a company's assets was authorized under the court's equity powers in conjunction with the Securities Exchange Act, which specifically only au-

thorized the court "to enjoin violations"; *McComb v. Frank C. Scerbo & Sons, Inc.*, 177 F.2d 137 (2d Cir. 1949), in which an order compelling the payment of unpaid overtime wages was obtained by the Wage and Hour Administration as ancillary to injunctive relief pursuant to the Court's inherent equity powers.

40. In requiring corporate insiders, who had bought stock without disclosing to sellers certain information about the corporation's recent ore discovery, to make restitution of their profits, the Second Circuit relied on its broad equity power in the absence of express authorization in the Securities Exchange Act of 1934. The Court of Appeals noted:

> The [district] court's order requires only restitution of the profits made by the violators prior to general knowledge of the ore strike . . . . It would severely defeat the purposes of the Act if a violator of Rule 10b-5 were allowed to retain the profits from his violation. *S.E.C. v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir. 1971), *cert. denied*, 404 U.S. 1005, 92 S. Ct. 561, *reh. denied*, 404 U.S. 1064, 92 S. Ct. 733.

41. In *Commonwealth v. DeCotis*, 316 N.E.2d 748 (Mass. 1974), the Supreme Court of Massachusetts held that the traditional equity power of the courts to grant full relief provided sufficient authority for Massachusetts courts to order funds to be placed in escrow by persons violating that state's mobile home lot rental act, in order that restitution could be made to consumers who had been forced, in violation of the act, to pay resale fees for mobile homes.

42. The English Statute of Charitable Uses, 43 Eliz. I (1601), c. 4, which remains effective in Virginia pursuant to § 1-11 of the Code, provided that in instances in which lands, goods, and money have been given for the relief of poor people, education of orphans, aid and help of "persons decayed," and other needy subjects, but such lands, goods, or money were not employed according to the charitable intent of the donors by reason of fraud, breaches of trust or negligence, appropriate orders, judg-

ments and decrees might be entered to cause the donations to be duly and faithfully employed for the charitable uses and intents for which they were given.

43. The general statutory grant of authority to this court found in § 57-59(c) is not only a grant of authority to enjoin any device, scheme, or artifice to defraud or obtain money by means of any false pretense, representation, or promise, but also a grant of authority to order "such other relief as the court deems appropriate." This statutory language does not change the common law reflected in the English Statute of Charitable Uses but should instead be interpreted in light of the historical actions reflected in the Statute of Charitable Uses. This is consistent with the Attorney General's authority to call for the exercise of the court's jurisdiction over funds solicited for charitable purposes. *See Clark v. Oliver*, 91 Va. 421, 427, 22 S.E. 175, 177 (1895).

44. The scope of the authority found in § 57-59(c) is further reflected by the scope of the bonding requirements set forth in § 57-61(b). This latter section requires a surety bond to run to the Commonwealth for use "in reimbursement for any penalties or losses resulting from malfeasance, nonfeasance, or misfeasance in the conduct of solicitation activities." A bond in favor of the Commonwealth would serve no purpose if this Court could not award the Commonwealth payments from it in cases such as this.

45. The scope of a surety bond required by this language in § 57-61(b) is much broader than that required in almost any other bonding requirement found in the Code of Virginia. *See e.g.*, § 3.1-772.5, relating to dealers in agricultural products ("any producer claiming to be injured by the nonpayment, fraud, deceit, or negligence of any dealer . . ."); § 3.1-249.9, relating to commercial pesticide applicators ("persons who may suffer legal damages as a result of the use of any pesticide . . ."); § 59.1-329, relating to membership camping operations ("to insure the escrow of purchase money and to insure completion of offered facilities"); § 59.1-265, relating to sellers of business opportunities ("any person who is damaged by any violation of this chapter or by the business opportunity seller's breach of the contract . . . or of any obligation arising therefrom . . ."); Section 56-302,

relating to motor vehicle carriers ("to pay any final judgment for damages sustained by the passengers . . ."); Section 13.1-400.3, relating to automobile clubs ("to secure the performance of its contracts"); and Section 38.2-4310, relating to health maintenance organizations ("as a guarantee that the obligations to the enrollees will be performed"). The broad language of the bonding requirement in § 57-61(b) supports an equally broad interpretation of the authority in § 57-59(c) to enter other appropriate orders, particularly orders to disgorge profits.

46. The solicitations which represented that donors were helping to send handicapped children and less fortunate people to performances, especially those instances in which the presentation was made that every five dollars would send another person, are instances of malfeasance or misfeasance in the conduct of solicitation activities. See Holloway v. Brown, 403 N.E.2d 191 (Ohio 1980). Further, the apparent conversion of charitable donations, as in the unexplained misappropriation of the $1,500 referred to in Paragraph 23, is malfeasance or misfeasance. With respect to Count V of the Amended Bill of Complaint, VTI's underpayment of approximately $593 to the Greater Chantilly Jaycees also constitutes malfeasance, nonfeasance, or misfeasance in the solicitation of contributions.

47. In view of the inherent equitable authority of this Court, the further statutory authority provided by § 57-59(c), as interpreted in light of the Statute of Charitable Uses and the broad bonding requirement of § 57-61(b), this Court has the authority to order Duchano and VTI to disgorge the profits which they have made through their deceptive solicitations.

48. According to VTI's own records, as summarized in Exhibit 96, VTI's profit on the seven reported projects was $101,790.20. In order to discourage VTI, Duchano, and other professional solicitors from engaging in deceptive solicitations about sending handicapped children and others to performances, judgment will be entered in favor of the Commonwealth on Count I in the amount of $101,790.20, with interest at the judgment rate of eight percent per year from December 1, 1988, which is a date well after all of the projects in question were concluded.

49. Pursuant to § 55-26.1 of the Code, every gift or grant made for charitable purposes shall be valid

as if made for the benefit of certain natural persons. Pursuant to § 55-27, such gifts to any corporation shall be held by the corporation for the uses prescribed by the donor. This section, in effect, has imposed upon VTI the duty to act as trustee in regard to the money which it received for the charitable purposes mentioned in its solicitations. It can be likened to the constructive trust imposed in *Brown v. Concerned Citizens*, 382 N.E.2d 1155 (Ohio 1978).

50. Pursuant to § 55-31, the so-called "cy pres" statute, if the charitable trust is impossible or impractical to perform, the donation must be used for some other educational, charitable, or benevolent purpose.

51. It is neither practical nor cost-efficient at this point to use the judgment to be awarded to the Commonwealth against VTI and Duchano to send handicapped children or other less fortunate people to performances.

52. The donors to the VTI solicitations intended generally to benefit handicapped children, as well as certain undefined, nebulous groups such as the "less fortunate." It is appropriate under the "cy pres" statute to apply the judgment to be awarded against VTI and Duchano to the benefit of handicapped children in some manner, though not necessarily for their attendance at performances. Appropriate services may include, among other things, the provision of medical treatment, boarding, counseling, job training, and recreational and sports opportunities for the handicapped.

53. With reference to Count IV of the Amended Bill of Complaint, the donations received by VTI on behalf of the Greater Chantilly Jaycees were impressed with a charitable trust pursuant to the statutes mentioned above. As trustee of these donations, VTI and Duchano were required to account for their expenditure. Additionally, pursuant to this Court's Order of August 19, 1988, Duchano was required to produce documentation of his expenditure of funds for the production of the show on or about September 21, 1985, for the Greater Chantilly Jaycees.

54. Other than his ledger sheets showing a $3,500 check payable to International Entertainments, and other than Homer Rhoads's testimony about the $377.80 rental fee, Duchano has failed to account for the alleged production expenses for the Greater Chantilly show. From the

Commonwealth's evidence, it appears that International Entertainment did not spend any of the $3,500 for the show. At best, Mr. Duchano's own testimony admits a $1,500 overcharge. Being unable to account for their expenses, Duchano and VTI must now pay to the Commonwealth $1,500 for the use and benefit of the Greater Chantilly Jaycees, or its successor in interest.

55. With reference to Count VI of the Amended Bill of Complaint, in view of the failure or refusal of VTI and Duchano to file an accounting or to explain their inability to do so, despite the request of the Office of Consumer Affairs, it is apparent that an injunction is necessary to compel their compliance with the requirement for § 57-61(a) of the Code.

56. Mr. Duchano was not a credible witness at trial. In several instances, his trial testimony contradicted his own corporate records or his prior deposition testimony.

Table No. 1

*Fundraising Projects at Issue*

Virginia Telemarketing, Inc. ("VTI")

| VTI Project Number | Amended Bill of Complaint Para. or Count | Show Date | Sponsor |
|---|---|---|---|
| 36 | 14 | 4/14/84 | Springfield Kiwanis |
| 37 | 14 | 4/14/84 | Bailey's Crossroads Kiwanis |
| 42 | 15 | 8/22/84 | Annandale Kiwanis |
| 43 | 15 | 8/22/84 | Manassas Jaycees |
| 44 | 16 | 12/10/84 | Falls Church Police Ass'n. |
| 46 & 54 | 17 | 3/24/85 | Springfield Kiwanis |
| 60 | 18 | 7/13/85 | Handicaps Unlimited |
| 63 | 19, IV, V | 9/21/85 | Chantilly Jaycees, a/k/a Greater Chantilly Jaycees |
| 65 | 20 | 12/16/85 | Falls Church Police Ass'n. |
| 66 | 21, VI | 3/23/86 | Falls Church Jaycees |
| 67 | 21, VI | 3/23/86 | Falls Church Police Ass'n. |

*Permanent Injunction and Final Judgment*

On November 30 and December 1, 1988, this matter was tried by the Court, without a jury. Respondents Virginia Telemarketing, Inc. ("VTI") and Robert J. Duchano ("Duchano") were represented by counsel, Respondent Allied Fidelity Insurance Co. was dismissed by stipulation previously. Respondent Peerless Insurance Co. and the Commonwealth entered into a settlement placed on the record at the beginning of the trial. Only Counts One, Four, Five, and Six of the Amended Bill of Complaint were tried. The Commonwealth withdrew Counts Two and Three.

Upon consideration of the Amended Bill of Complaint, Answers, clear, cogent, and convincing evidence consisting of the Commonwealth's Request for Admissions and exhibits thereto, the Supplemental Response of VTI and Duchano to the Request for Admissions, the transcripts of the depositions of Duchano and exhibits thereto, other exhibits introduced at trial, testimony of several witnesses, memoranda, and argument of counsel, and for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law entered by the Court,

.It is hereby ordered that:

1. As used herein, "Duchano" shall mean Respondent, Robert J. Duchano, individually and all corporations and other entities in which he owns a majority of the stock or over which he possesses control, his and their employees and agents, and all other persons with knowledge of this injunction who are working in concert with him or them.

2. Within thirty days of this date, Duchano shall file with the Virginia Office of Consumer Affairs a final accounting report of all funds collected and all expenses paid in connection with the solicitation of contributions: (a) for the Falls Church Jaycees and Falls Church Police Association Show on or about March 23, 1986; and (b) for all other solicitation campaigns completed by Duchano in Virginia prior to September 1, 1988, for which he has not previously filed a final accounting.

3. Duchano shall not represent, in any solicitation, that tickets (whether called "passes" or some other name) to events will be donated for use by another, or that donations will send or sponsor people to events, unless he complies with the following requirements:

(1) He shall have obtained commitments, in writing, from persons or charitable or civic organizations stating that they will accept donated tickets and specifying the number of persons for whom they are willing to accept tickets;

(2) He shall not collect or accept more contributions for donated tickets than the number of ticket commitments he has received from persons or charitable or civic organizations;

(3) He shall have printed in advance on each ticket the exact number of persons to be admitted by the ticket and the price or value of each ticket;

(4) He shall distribute the tickets in a timely fashion to those having given commitments; and

(5) He shall maintain during the solicitation and for a period of three years thereafter: (a) records reflecting the name and address of each contributor and the amount of money and number of tickets donated by each such contributor; and (b) the written commitments of each person, charitable or civil organization to accept tickets and specifying the number of persons on whose behalf tickets were to be accepted, as required above.

4. If Duchano intends to make, or does in fact make, a profit on the booking or arrangement of performers in connection with the solicitation of contributions, he shall disclose in writing the amount of such profit to his client, charitable or civic associations, and shall label the amount as "additional profit to be earned by Robert J. Duchano or entity controlled by him in the booking of performance."

5. The Commonwealth shall have judgment against and recover from Robert J. Duchano, individually, and Virginia Telemarketing, Inc., jointly and severally, the sum of $103,883.44 (with interest at the judgment rate of 8% from December 1, 1988), consisting of $2,092.63 as trustee for the use and benefit of the Greater Chantilly Jaycees, or, as its successor in interest, the Virginia State Jaycees, and $101,790.20 as trustee for the relief or

benefit of handicapped children. This latter sum, when collected in whole or in part, shall be distributed by the Commonwealth, pursuant to the discretion of the Attorney General, to one or more charitable organizations which is: (a) located in Virginia; (b) duly registered with the Virginia Office of Consumer Affairs; and (c) active in the provision of services to handicapped children.

6. The Commonwealth shall further recover its costs under § 14.1-189 of the Code in this behalf against Robert J. Duchano and Virginia Telemarketing, Inc., jointly and severally.

7. The Clerk of this Court shall docket these judgments against Robert J. Duchano and Virginia Telemarketing, Inc. The clerk shall also mail a certified copy of this Permanent Injunction and Final Judgment, and of the accompanying Findings of Fact and Conclusions of Law, to counsel of record for each party.

8. This Permanent Injunction and Final Judgment is entered by the Court after prior notice to counsel of record of the date and place for entry hereof. Defendants' objections to entry of this Order are noted and overruled to which the defendants except.