## CIRCUIT COURT OF THE CITY OF NORFOLK

Lawyers Title Ins. Corp.

v.

P.R.T. Enterprises, Inc.,
and Pedro Robert Moraes

July 30, 2004

Case No. (Chancery) 02-2424

BY JUDGE LYDIA CALVERT TAYLOR

This matter came to be heard by the Court, as Chancellor, on plaintiff Lawyers Title Insurance Corporation's (" Lawyers Title" ) petition to recover on a federal judgment on which defendant PRT Enterprises had defaulted as debtor in the U.S. District Court for the Eastern District of Virginia. Lawyers Title purchased that judgment, thus paying PRT's debt and becoming subrogated to the rights of the federal judgment creditor. Lawyers Title was obliged to clear that cloud on the land title created by the judgment in federal court, which had been registered as a lien on the property, to satisfy its contractual duty to the purchaser of land from PRT to guarantee that PRT's title was free of any encumbrances.

As PRT is insolvent, Lawyers Title seeks to hold PRT's two shareholders, Rubens Paulo Taddei and Pedro Robert Moraes, personally liable for the

corporation's failure to satisfy that debt. This Court finds the individual, defendants, Taddei and Moraes, to be personally liable to Lawyers Title on PRT's default judgment entered in the Eastern District of Virginia and thus enters judgment against them in the chancery action in this Court.

*Facts*

On November 15, 2001, PRT had sold its last remaining asset, a parcel of land at 3535 North Military Highway, Norfolk, Virginia, to 3535 Norfolk, L.L.C., for $430,000.00. Because there was a time gap in the sale between the signing of the sales agreement on November 15, 2001, and the closing, which took place December 28, 2001, the buyer, 3535 Norfolk, L.L.C., purchased title insurance from Lawyers Title to ensure that there would be no clouds on its title once the closing occurred. To assure a cloudless title, Plaintiff proceeded to procure an affidavit, signed December 28, 2001, from one of PRT's three directors, Pedro Moraes, who was also 51% owner in PRT,[1] stating that, *inter alia*, he knew of no "judgment liens" against the property. In fact, Moraes was aware at that time that PRT had defaulted on a judgment taken against it in the Eastern District of Virginia in the amount of $25,000 plus $11,925 in attorney's fees, on December 12, 2001; Moraes and PRT had proper notice beforehand of that action in the federal court.[2] That judgment was brought to the Clerk of Court for the City of Norfolk on that day by the judgment creditor, but the Clerk's Office did not index it until January 2002, well after three money transfers were made by the buyer at the request of Moraes, in payment for the 3535 North Military property.[3]

Moraes was also aware that state court proceedings were occurring upon the petition of the Norfolk Airport Authority for judgment on a debt PRT owed NAA in the amount of $165,295.44. Because PRT and its owners did not appear or oppose that action, default judgment was entered against PRT for $165,295.44 on December 28, 2001, in state court, which action was

---

[1] The remaining 49% was owned by Rubens Taddei. Taddei was also a director, but he is not a party to this action because he has reached a settlement with Lawyers Title. The third PRT director was Moraes= daughter, who has no ownership in PRT and is not a defendant here.

[2] On that judgment, which was instituted in September 2001, a motion to reopen was filed by PRT in federal court in Norfolk on December 19, 2001, but its motion was denied as Afrivolous.≅ Although an appeal was noted by defendant PRT, it was not perfected.

[3] Moraes instructed closing counsel that $30,000 of the sale price was to be wired to PRT=s bank account to pay off *other* creditors, not Plaintiff, Lawyers Title, or its subrogor, 3535 Norfolk, L.L.C. Moraes had the remaining $295,797.72 wired to Moraes= and Taddei=s personal accounts, in proportion to their 51/49 share of the ownership of PRT.

guaranteed by PRT's failure to appear and oppose the motion for judgment on the very day Moraes falsely signed the Lawyers Title affidavit.

Fulfilling its duty as insurer of the title to the property, when Lawyers Title became aware of the judgment lien against the title, it purchased the December 12, 2001, judgment of $25,000, plus $12,035 in attorney's fees, from the default creditor for $34,000. Then Lawyers Title, as subrogee to the default creditor's claim, instituted this suit in its own name on December 27, 2002, to recover the $34,000, plus interest and attorneys' fees, that it had paid to clear the title as guaranteed for the purchaser. On August 21, 2003, Moraes and Taddei, as representatives of PRT, submitted their answer to this suit but never answered Lawyers Title's requests for admissions. As such, all of the unanswered admissions were deemed admitted pursuant to Rule 4:11(a) of the Rules of the Supreme Court of Virginia. As well, PRT and Moraes never answered any discovery requests or interrogatories served on them by Lawyers Title.

Neither Moraes, Taddei, nor any other representative of PRT was present at the January 28, 2004, trial in this matter, despite the fact that they were both subpoenaed by Lawyers Title and received proper notice of the proceedings, but counsel appeared for PRT and Moraes and participated in the trial. Lawyers Title first moved for summary judgment based on the affidavits and admissions it had received from Moraes and Taddei. When this Court denied that motion, Lawyers Title moved for default judgment, which was also denied.

Although this Court required Lawyers Title to prove its case, it ruled that Defendants would be sanctioned for their previous failure to cooperate with these proceedings, in ignoring discovery and their subpoenas for trial, by resolving every disputed question of fact in the light most favorable to Lawyers Title, that is, by drawing every reasonable inference adverse to defendants where they had failed to elaborate the facts for the Defendant in discovery.

At the close of the evidence, Lawyers Title argued that, because Moraes and Taddei personally received a substantial portion of the proceeds of the sale of the property to 3535 Norfolk at a time PRT was otherwise insolvent, this Court should pierce the corporate veil or otherwise hold Moraes and Taddei personally liable for the debts. It variously characterized Defendants' conduct in diverting the sales proceeds as an unlawful distribution, fraudulent and/or voluntary conveyance, perpetration of fraud, breach of fiduciary duty, and/or conversion of funds. In addition, Lawyers Title also asked for attorneys' fees of $18,600 incurred in bringing and prosecuting this action.

*Discussion*

I. *Piercing the Corporate Veil*

In order to impose personal liability on a shareholder of a corporation in Virginia on the basis of piercing the corporate veil, two elements must be shown. First, it must be proved that the corporate entity was the "alter ego" of the individual against whom liability is sought. *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212 (1987). Second, it must be shown that the corporation was created as "a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Id.* The Supreme Court of Virginia has stated:

> Just when a corporation will be regarded as the adjunct, creature, instrumentality, device, stooge, or dummy of another corporation is usually held to be a question of fact in each case. ... and courts will disregard the separate legal identities of the corporation only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other.

*Lewis Trucking Corp. v. Commonwealth*, 207 Va. 23, 31 (1966) (quoting *Beale v. Kappa Alpha Order*, 192 Va. 382, 399 (1951)). However, a refusal to grant a shareholder the immunity that the corporate form provides "constitutes >an extraordinary exception' to be permitted only when it becomes necessary to promote justice." *Cheatle*, 234 Va. at 212 (quoting *Beale*, 192 Va. at 397).

In the case at bar, Lawyers Title introduced no evidence, outside of events described above, that PRT did not adhere to corporate formalities and was merely an alter ego of Moraes and Taddei. No evidence was presented that PRT was *created* as a sham corporation with the intent to obscure fraud; on the contrary, the corporation apparently engaged in legitimate business operations for some time before financial troubles set in. When finances began to unravel, Taddei and Moraes unquestionably acted in bad faith in their capacities as directors and shareholders, but that additional element alone does not allow this Court to invoke the "extraordinary exception" that constitutes piercing the corporate veil.

Instead, under Virginia law, justice can be promoted in the case at bar without distorting that corporate doctrine; in fact, individual liability can be imposed on an officer, director, or employee when he or she personally conducts the corporation's affairs in an illegal manner. The Supreme Court of Virginia has stated, "A corporation can act only through its officers and agents and where the business itself involved a violation of the law, the correct rule is that all who participate in it are liable." *Crall v. Commonwealth*, 103 Va. 855

(1905). This theory of recovery extends beyond just those who operate a sham corporation, but does "[require] >active' participation in the conduct of the corporation's affairs" for individual liability to be imposed. *Commonwealth v. Greenberg*, 42 Va. Cir. 160 (1997); *see also Bourgeois v. Commonwealth*, 217 Va. 268 (1976) (" An officer cannot avoid criminal responsibility for an illegal act on the ground that it was done in his official capacity or through the instrumentality of the corporation which he controls and dominates and which he has employed for that purpose." ); *Commonwealth v. Virginia Telemarketing, Inc.*, 15 Va. Cir. 489 (1989). Thus, Lawyers Title need only prove in the case at bar that Moraes and Taddei used the corporation to carry out an illegal act.

## II. *Illegal Acts*

### A. *Unlawful Distribution*

Virginia Code § 13.1-907 makes it clear that, upon dissolution of a corporate entity, the assets of the corporation shall first be used to satisfy its "liabilities and obligations." It is likewise clear and convincing from the evidence presented in this case that Moraes directed that only a small portion of the proceeds of the sale of the property in question be wired to pay other debts into PRT's corporate account, while instructing the buyer, 3535 Norfolk's representatives, to wire the remaining $295,797.72 (more than 90% of the total paid at the sale) into Moraes' and Taddei's *personal* bank accounts. The evidence adduced at trial showed clearly and convincingly that Moraes was aware of the collection proceedings instituted against PRT, if not the actual judgments. There was further evidence in the form of a letter from PRT's attorneys to Lawyers Title that the debts of PRT totaled in the "millions." As the only two owners of PRT and two of the three members of its board of directors, Moraes and Taddei most certainly were fully aware of PRT's dire state of affairs, and the post-judgment motions filed in that federal court clearly prove the Defendants' awareness of the suit and default judgment motion in the federal action.

Unless a director is acting in good faith in authorizing a distribution that ultimately turns out to be unlawful, that director is "personally liable to the corporation and its creditors for the amount of the distribution that exceeds what could have been distributed" in compliance with § 13.1-907. Va. Code § 13.1-692. Thus, the only two shareholders, Taddei and Moraes, by procuring a significant personal pecuniary benefit from the sale of the property owned by their corporation, while knowing that PRT was in financial dire straits, both made themselves personally liable to each of PRT's debtors, including

Lawyers Title. As such, Lawyers Title, having settled with Taddei, is entitled to ask this Court for a personal judgment against Moraes individually as a result of his pursuit of his own financial well-being, in flagrant dereliction of his statutory duty as a director of PRT corporation. In addition, no evidence showed that dispersal of funds, in fact, a shareholder distribution, was every properly approved by a formal board vote.

## B. *Fraudulent/Voluntary Conveyance*

Lawyers Title also seeks to invoke Virginia Code §§ 55-80 and/or 55-81 to void to the extent of the money owed to Lawyers Title the transfer of funds owed by the buyer to PRT directly to the personal accounts of Moraes and Taddei. The fact that the proceeds of the sale were wired directly into Moraes' and Taddei's personal bank accounts by the buyer rather than into PRT's and then into their two accounts is a difference without a distinction. The sales proceeds represented a corporate asset, apparently the last substantial corporate asset, diverted from PRT's debtors to the personal benefit of PRT's two top officers and its only shareholders. Because the property was held in the name of PRT, PRT and its creditors should have been the true beneficiary of the sale. However, Moraes and Taddei, for obvious reasons, elected to bypass PRT's bank account in making what is, in essence, a shareholder distribution in fraud of its creditors.

Such a conveyance, even if not fraudulent, is nonetheless voluntary. Virginia Code § 55-80 allows any creditor to petition a court to void a conveyance *of any type* from its debtor to a third party on the basis that valuable consideration was not obtained and that it was therefore fraudulently made. The creditor need only show that the conveyance was made with the intent to delay, hinder, or defraud creditors. There is little doubt that Moraes knew that PRT had at least two judgments against it when he directed the proceeds of the sale of the property to be made primarily to him and Taddei directly; his attorney's letter conceded that millions were owed by PRT, putting it in dire financial straits. Such an action must be construed under the circumstances as indicating an intent to hinder or defraud creditors. Defendants produced no evidence that Moraes and Taddei were themselves creditors to PRT. Even if they had presented such proof, however, and, while preferences are allowed under § 55-80, those made to a creditor who is in complete control of the corporation affairs are *per se* fraudulent, though those creditors may share *pro rata* in the corporation's remaining assets. *See APAC-Virginia, Inc. v. Jenkins Landscaping & Excavating, Inc.*, 93 Bankr. 84 (W.D. Va. 1988); *Mills v. Miller Harness Co.*, 229 Va. 155 (1985).

Even had fraudulent intent, however, not been proven by Lawyers Title — and in fact this Court believes such has been proven by clear and convincing evidence — there is little doubt that the *de facto* shareholder "dividend" paid to Moraes and Taddei constituted a voluntary conveyance in contravention of Virginia Code § 55-81. Instead of proving that the conveyance was made to hinder, delay, or defraud creditors, that statute only requires that creditors show (1) they were indeed creditors prior to the conveyance, (2) that the debtor was insolvent or that the conveyance precipitated insolvency, and (3) that no valuable consideration was paid by the grantee. One is considered insolvent when he has insufficient property to pay all his debts. *Hudson v. Hudson*, 249 Va. 335 (1995).

As its own attorney admitted, PRT was millions in debt and had several judgments against it. The property that it sold to 3535 Norfolk was conceded to be its last remaining asset. Therefore, it is clear that PRT was insolvent at the time of the sale. It is equally clear that Lawyers Title was subrogee to a judgment creditor on a default judgment entered a few weeks *before* the conveyance was made, a fact known to Moraes at the time, even if the judgment lien is viewed as not perfected due to the clerk's failure to index the lien immediately.[4] Finally, Moraes and Taddei did not claim to have given valuable consideration in exchange for the sales money they received through PRT. Therefore, the conveyance to Moraes and Taddei of the proceeds PRT received from the sale of the property in question should be voided, not only as a violation of Virginia Code § 55-80, but of § 55-81 as well.

### C. Breach of Fiduciary Duty

Virginia's fraudulent conveyance statute is actually based on the concept that a corporation's directors hold a corporation's assets in trust for its creditors. *Rapids Constr. Co. v. Malone*, 1998 U.S. App. LEXIS 4649, *13, *6 (4th Cir. 1998) (" [T]he controlling shareholders of a corporation have a duty to pay the corporate liabilities to outside creditors before they may receive any of the residuum of the corporation's assets." ) (citing *Ashworth v. Hagan Estates, Inc.*, 165 Va. 151 (1935)). If one who is not a bona fide purchaser for value receives a corporation's assets, a creditor retains a traceable, equitable lien in the assets. *Id.* As the Fourth Circuit Court of Appeals stated in interpreting Virginia law (most notably in *Marshall v. Fredricksburg Lumber Co.*, 162 Va. 136 (1934)), "[T]he trust fund doctrine gives creditors an equitable right of recovery against shareholders who take assets from a

---

[4] There is a plausible legal argument that the judgment lien was validly noticed when it was filed with the Clerk, even if the Clerk failed to index it. However, the Court is not required to reach that novel issue under Virginia law.

dissolving corporation." *Id.* at *14. As such, there is no doubt in the case at bar that Moraes and Taddei breached their fiduciary duties to PRT's creditors when they accepted the bulk of the proceeds from the sale of the property, its last asset.

## III. *Attorneys' Fees*

Lawyers Title has asked this Court to award it attorneys' fees in the amount of $18,600 that it incurred in bringing this action. In order for this Court to do so, it must find either a contractual or statutory basis. The contract, being the actual affidavit Moraes signed on December 28, 2001, in which he asserted there were no judgment liens against PRT, clearly requires PRT to indemnify Lawyers Title's for its attorneys' fees incurred in clearing any liens or encumbrances. And while the defense argues that the only attorneys' fees Lawyers Title would be entitled to are those in the amount of $12,035 awarded in the initial judgment in the Eastern District of Virginia, that is arguably not the case. Lawyers Title included in its $34,000 purchase of the default judgment gotten in federal court the $12,035 awarded the subrogor's attorneys by the federal judge; the $18,600 (and counting) since spent was not expended "clearing this lien," the very action contemplated in the affidavit, but rather in collecting its (Lawyers Title's) own judgment as subrogee.

Even if not read in that fashion, however, the very next clause in the affidavit would seem to divest Lawyers Title of its right to attorneys' fees in this action:

> The foregoing hold harmless and indemnity shall not be effective with respect to any encumbrance, lien, or other objectionable title matter *which is of record at the time the documents creating the interest are delivered to the Clerk's Office for recordation* or of which Lawyers Title Insurance Corporation becomes aware prior to recordation, unless the owner consents to recordation after it has been advised of the existence of such encumbrance, lien, or other objectionable matter.

(Emphasis added.)

The contract only requires indemnification for attorneys' fees for matters that are "of record" when they are delivered to the Clerk's Office and makes no proviso for responsibility for lawyers' fees at any instance in which the Clerk's Office fails to docket the judgment creating the lien, even if it is actually received by that office. The affidavit does not define the term "of record;" if this Court gives it its ordinary meaning, it is to be interpreted as "a

matter of *public* record." Clearly, the default judgment entered in the Eastern District of Virginia was a matter of public record within the context of the affidavit on the date it was entered in federal court. Thus, where the Clerk's Office did not perform its duty correctly and failed to index the judgment, the contract/affidavit must be strictly construed against its maker, Lawyers Title.

If no contractual basis exists in this case for awarding attorneys' fees, the only remaining justification for doing so must be statutory. Lawyers Title is correct in stating that Virginia Code § 55-82 states, "the court shall allow counsel for the creditors a reasonable attorney's fee to be paid out of the proceeds of sale as other costs are paid provided the attorney's fees allowed does not affect a prior lien creditor not represented by such attorney." However, Lawyers Title has not proffered any evidence showing that all previous lien creditors have been paid. If Lawyers Title cannot do so, which this Court sees as highly unlikely given the vast amount of debt PRT accrued, then this Court has no statutory basis upon which to grant Lawyers Title attorneys' fees.

Lawyers Title asserts that the third basis in this case upon which attorneys' fees could be granted is on the premise that a court, sitting in equity, has the authority to award attorneys' fees in conjunction with a finding of fraud. *See Prospect Devel. Co. v. Bershader*, 258 Va. 75 (1987). The claim made by Lawyers Title is that when Moraes signed the contract with Lawyers Title, the affidavit, he was aware of a judgment lien attached to the property, not just a judgment against PRT. This Court, however, is of the opinion that Lawyers Title cannot prove by clear and convincing evidence that Moraes had knowledge of a judgment lien because the default judgment from the Eastern District of Virginia did not become an actual lien until it was docketed in accordance with Virginia Code § 8.01-458, an event that occurred after Moraes signed the affidavit. While Moraes most assuredly knew the default judgment had been entered by the Eastern District of Virginia on December 12, 2001, Lawyers Title did not produce evidence that he was aware that the judgment was *filed with the Norfolk Circuit Court Clerk's Office* on that day, thus creating a lien. As Lawyers Title was not aware of that fact, it is difficult for them to argue, without any type of proof, that Moraes must have known himself of the filing of that lien by PRT's federal judgment creditor. While the difference between a judgment and a judgment lien could be considered a technicality, this Court finds that, under Lawyers Title's theory of fraud for recovery of attorney's fees, it has not proven the facts that would entitle it to such an award.

## Conclusion

This Court has determined that Moraes is personally liable for using the corporation to carry out an unlawful distribution and a fraudulent and voluntary conveyance.[5] Further, his actions created a breach of the fiduciary duty he owed to PRT's creditors, including Lawyers Title.[6] The Court, however, denies attorneys fees due to the lack of any statutory or contractual bases for doing so, as set out above.

---

[5] The Court does not need to so find for Taddei, as he has already reached a settlement with Lawyers Title.

[6] Because this Court has found numerous other bases upon which to grant Lawyers Title relief, it is unnecessary to address Lawyers Title=s alternative theory of conversion.