UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Malveaux, Athey and Callins
Argued at Lexington, Virginia

JEREMIAH HOWARD SWEET

                                            MEMORANDUM OPINION[*] BY
v.      Record No. 0462-22-3         JUDGE MARY BENNETT MALVEAUX
                                               MARCH 28, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF HENRY COUNTY
Marcus A. Brinks, Judge

Michelle C.F. Derrico, Senior Assistant Public Defender (Virginia
Indigent Defense Commission, on briefs), for appellant.

William K. Hamilton, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Jeremiah Howard Sweet ("appellant") was convicted in a bench trial of four counts of

obtaining money by false pretenses, in violation of Code § 18.2-178. On appeal, he argues the

evidence was insufficient to prove that he had the intent to defraud. Appellant also contends that the

trial court erred in refusing to apply the single larceny doctrine to the facts of his case. For the

following reasons, we affirm the trial court.

## I. BACKGROUND

"Under well-settled principles of appellate review, we consider the evidence presented at

trial in the light most favorable to the Commonwealth, the prevailing party below." *Vay v.*

*Commonwealth*, 67 Va. App. 236, 242 (2017) (quoting *Smallwood v. Commonwealth*, 278 Va. 625,

629 (2009)). "This principle requires us to 'discard the evidence of the accused in conflict with that

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413.

of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Id.* (quoting *Parks v. Commonwealth*, 221 Va. 492, 498 (1980)).

A. <u>The Gray Family and Their Augusta Street Home</u>

Bernie F. Gray, Jr., and his wife, Cindy, lived in a home on Augusta Street in Martinsville until late 2016, at which time they moved to a new home nearby. When they moved, Bernie and Cindy left many of their personal belongings, including furnishings, in the Augusta Street house. No one else resided in the Augusta Street house after Bernie and Cindy moved away. Bernie passed away in February 2019.

Bernie's son, Stafford, was a co-administrator of his father's estate. He knew that Bernie had sometimes hired people to perform work on the Augusta Street house and its yard, but had never met and did not know any of the hired workers. After Bernie's death, Stafford learned that appellant lived next door to the Augusta Street house. Stafford did not write any checks to appellant, nor did he give him permission to cash any checks from Bernie's bank accounts.

Cindy's sister, Lori Jones, testified that she had often visited Cindy and Bernie at the Augusta Street house and that she knew appellant as Bernie and Cindy's neighbor. In May 2019, Lori and Cindy went to the house on Augusta Street to check for indications of breaking and entering. Lori did not see any signs of forced entry and saw "nothing out of the ordinary upstairs," but in the basement, she discovered that all the drawers in Bernie's desk were open and "papers were just str[e]wn everywhere." Lori testified that on prior occasions when she had visited the home, Bernie's desk had been in an orderly condition.

While Lori and Cindy observed the scene in the basement, they heard footsteps upstairs. The women investigated and found that appellant's son had entered the house through the front

door, which Lori and Cindy had left unlocked. Lori also testified that before his death, Bernie was in good health and had typically done the maintenance on the house on Augusta Street.[1]

### B. The Checks Cashed on Bernie Gray's Defunct Account

Sean Harrigan was the Director of Compliance at Blue Ridge Bank. In that position, Harrigan had full access to the bank's records and was responsible for reviewing potentially fraudulent transactions. He testified that Bernie had initially maintained a personal checking account with Blue Ridge Bank that had an account number ending in 6910. In March 2018, Bernie closed that account and transferred its balance to a new personal checking account that had a different account number. Several weeks after Bernie's death, that account had been closed out. Bernie's name had been the only name on each account.

Rhonda Sowder-Shough was a teller at the Collinsville branch of ValleyStar Credit Union. She testified that on May 17, 2019, she cashed a May 15, 2019 check made out to appellant in the amount of $1,375 that was drawn on Bernie's Blue Ridge Bank account ending in 6910. The check's subject line indicated it was a payment for "work," and the check appeared to bear Bernie's signature. On May 21, 2019, Sowder-Shough cashed a second check made out to appellant that was dated May 17, 2019. That check, drawn on the same account as the one cashed four days earlier, was for $790. The check appeared to bear Bernie's signature and the subject line indicated it was a payment for "work" and to "Pay Hank." Appellant had endorsed both checks.

Cierra Pittman was a teller at the Martinsville branch of ValleyStar Credit Union. Pittman testified that on May 18, 2019, she cashed a check for appellant dated May 17, 2019 and made out to him in the amount of $1,150. The check was drawn on Bernie's Blue Ridge Bank account ending in 6910, appeared to bear Bernie's signature, and stated in the subject line, "Pay Check &

---

[1] Lori also testified that Cindy had passed away in November 2019, approximately six months after the discovery of the rifled desk.

250.00 . . . for supplies." On May 22, 2019, Pittman cashed for appellant a May 21, 2019 check that was drawn on the same account and was made out to appellant in the amount of $1,460. That check also appeared to bear Bernie's signature and its subject line indicated it was for "Final Payment for Job # 818." Both checks were endorsed by appellant.

April Young, a collections manager at ValleyStar Credit Union, testified that she learned that the four checks cashed by appellant had been returned to the credit union, unpaid. Young knew that Bernie was deceased and telephoned appellant to inquire about the checks. When Young called the number listed under appellant's credit union account and identified herself, the person who answered the phone hung up. However, "[w]ithin just a couple of minutes," appellant called and said he was "calling [her] back." Young then asked appellant about the returned checks drawn on Bernie's Blue Ridge Bank account. She told him that she "knew that [Bernie] was deceased and needed to talk to [appellant] about that, because . . . clearly [Bernie] couldn't have wrote th[o]se checks." Appellant explained "that a man named Frank had wrote these [checks] to him on a job site and that he would look further into it and call [Young] back," but he never called Young again. Young also sent appellant four separate letters, one for each returned check, informing him that his account was frozen until the credit union was reimbursed. Appellant did not return any of the money.

Tim Montrief investigated the matter of Bernie's checks for the Henry County Sheriff's Office. He met with Cindy on May 23, 2019, and she advised him that no one had been doing any work on the Augusta Street house. She also stated that she was unaware of Bernie having asked anyone to do any work for him.

### C. Appellant's Testimony and Other Events at Trial

Appellant testified that he had lived next door to Bernie and Cindy on Augusta Street for eight to ten years. He stated that shortly before Bernie and Cindy moved to their new home, Bernie

- 4 -

asked appellant if he would "work for him a little bit." The work was out of doors and entailed mowing, pruning, and "weed eating." Appellant performed these tasks every two weeks and was paid fifty dollars for mowing the front and back yards, fifteen dollars for pruning bushes, and fifteen dollars to eliminate weeds. He continued this work for about three years and was still doing the work after Cindy died.[2] Appellant also testified that Bernie had asked him to do other types of outdoor work, including pressure washing the house, painting, cleaning the gutters, fixing the carport, and working on a rock wall. Bernie always paid appellant by either cash or check, and appellant stated that he kept receipts for all the work he did at the Augusta Street house. Appellant was still working on the carport when Bernie passed away.

Appellant stated that after he learned of Bernie's death, "a guy named 'Rob' had given [him] the . . . checks" for his work on the Augusta Street property. He said he had met Rob when Rob stopped by the Augusta Street house. Rob "said he was there to do the lawn" and "the yard maintenance," and appellant told him, "[y]ou don't have to worry about that. I have been taking care of it." Appellant asked Rob if he would take Cindy some receipts for the work he had done so that appellant could get paid, and Rob said, "he'd be glad to, and a couple of days later, he brought [appellant] a check." That check, dated May 15, 2019, was "already written out." Two days later, Rob returned with another check, completed and signed, in the amount of $790. Appellant testified that over the next few days, Rob provided him with additional, completed checks in the amount of $1,150 and $1,460. He stated that the checks were consistent with the amounts in his receipts.

Appellant specifically denied telling Young that he had received the checks from a man named Frank and insisted he had told her the checks came from Rob. During cross-examination, appellant initially stated that he could not pronounce Rob's last name, but then said that it might

---

[2] On cross-examination, appellant admitted that the last time he went on the property was before his preliminary hearing in October 2019, a month before Cindy's death.

have been "[s]omething like" Grogan. Appellant acknowledged that he did not ask Rob for a telephone number or business card before entrusting him with the only copies of his receipts documenting his work. Asked if he had seen Rob after receiving the checks from him, appellant stated that he had seen Rob the previous day but had not mentioned his legal issues to him. When asked whether it had struck him as "a little weird" that the checks he received from Rob had been signed by a man appellant knew was dead, appellant responded, "I didn't think about it."

After the defense rested, appellant made a motion to strike and argued that there was no evidence he had intended to defraud the credit union when he cashed the checks. The trial court denied the motion and convicted appellant of four counts of obtaining money by false pretenses. The court concluded that appellant had presented "the 'some dude' defense. Some other guy did it. I don't know what happened. [Rob] just showed up." Noting appellant's testimony that "I gave him all of these valuable documents to take to [Cindy] . . . and then, 'The day before court I see . . . Rob and I don't think to tell him anything about the case I've got tomorrow with all of these felonies,'" the court found that appellant's account was "preposterous." It also found that appellant "knew [Bernie] for quite some time" and that appellant "got these checks, and he knew they weren't good because . . . [Bernie] was dead."

Appellant filed a post-trial motion to set aside the verdict, reiterating his sufficiency argument and additionally arguing that the trial court should dismiss three of the four larceny indictments under the single larceny doctrine. The trial court denied the motion. This appeal followed.

## II. ANALYSIS

### A. Sufficiency of the Evidence

Appellant acknowledges that he cashed checks written on a closed account but argues that the trial court erred in finding the evidence sufficient to prove he acted with intent to defraud. He

contends that there is "virtually no evidence" demonstrating that he knew the account was closed at the time he cashed the checks or supporting an inference that he knew the checks were unauthorized or written on a closed account. Appellant also argues that the circumstantial evidence in his case did not exclude the possibility that he "genuinely believed Rob was a legitimate representative" of Bernie's estate who was "helping to facilitate payment for work [appellant] had indisputably provided."

"When reviewing the sufficiency of the evidence, '[t]he judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *McGowan v. Commonwealth*, 72 Va. App. 513, 521 (2020) (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "In such cases, '[t]he Court does not ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Secret v. Commonwealth*, 296 Va. 204, 228 (2018)). "Rather, the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016) (quoting *Williams v. Commonwealth*, 278 Va. 190, 193 (2009)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *McGowan*, 72 Va. App. at 521 (quoting *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018)).

Code § 18.2-178(A) provides, in pertinent part, that "[i]f any person obtain, by any false pretense or token, from any person, with intent to defraud, money . . . or other property that may be the subject of larceny, he shall be deemed guilty of larceny thereof." Thus, "[t]o sustain a conviction of larceny by false pretense, the Commonwealth must prove," among other elements, "'an intent to defraud.'" *Austin v. Commonwealth*, 60 Va. App. 60, 66 (2012) (quoting *Bourgeois v. Commonwealth*, 217 Va. 268, 272 (1976)). Additionally, "[t]here must be proof that . . . 'the

- 7 -

fraudulent intent . . . existed at the time the false pretenses were made, by which the property was obtained.'" *Id.* (quoting *Orr v. Commonwealth*, 229 Va. 298, 301 (1985)).

"'Intent to defraud' has been defined by this Court as acting 'with an evil intent, or with the specific intent to deceive or trick.'" *Beshah v. Commonwealth*, 60 Va. App. 161, 170 (2012) (quoting *Campbell v. Commonwealth*, 14 Va. App. 988, 990 (1992) (*en banc*), *aff'd on other grounds*, 246 Va. 174 (1993)). Such intent "means that the defendant intends to 'deceive another person, and to induce such other person, in reliance upon such deception, to assume, create, transfer, alter, or terminate a right, obligation or power with reference to property.'" *Bray v. Commonwealth*, 9 Va. App. 417, 422 (1990) (quoting *Black's Law Dictionary* 381 (5th ed. 1979)). "Intent may, and most often must, be proven by circumstantial evidence and the reasonable inferences to be drawn from proven facts are within the province of the trier of fact." *Sarka v. Commonwealth*, 73 Va. App. 56, 67 (2021) (quoting *Fleming v. Commonwealth*, 13 Va. App. 349, 353 (1991)). "In determining a defendant's intent, '[c]ircumstantial evidence is as competent and is entitled to as much weight as direct evidence, provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Id.* (alteration in original) (quoting *Coleman v. Commonwealth*, 226 Va. 31, 53 (1983)). "[T]he conduct and representations of the defendant" are circumstances to consider in deciding whether fraudulent intent exists in a particular case, and "[w]hether fraud actually existed will depend upon the circumstances of each case." *Rader v. Commonwealth*, 15 Va. App. 325, 329 (1992) (quoting *Norman v. Commonwealth*, 2 Va. App. 518, 519, 520 (1986)).

Here, the evidence proved that appellant cashed four checks drawn on a bank account that had been closed for over a year. The checks were all dated in May 2019, more than two months after Bernie's death, and appeared to be signed by Bernie. Appellant acknowledged that he knew Bernie was dead when he allegedly received the checks from a third party but said he "didn't think about" the fact that the checks had supposedly been signed by a dead man. Appellant proceeded to

cash the checks on four separate dates within one week, alternating between two different credit union branches. Notably, the checks were cashed close in time to when Lori and Cindy discovered Bernie's desk in disarray and appellant's son walking through the house unannounced. When Young, the credit union's collections manager, contacted appellant about the returned checks and identified herself, appellant initially hung up on her. He then called her back and told her someone named Frank had given him the checks in exchange for work done on the Augusta Street property. Appellant said he would investigate the matter of the returned checks and call back, but he neither contacted Young again nor returned the credit union's money. Later, at trial, he denied telling Young he had received the checks from Frank and insisted he had received them from Rob. Although Rob was unknown to appellant, and despite appellant not having obtained any contact information from Rob, appellant claimed he then entrusted Rob with his only copies of his receipts for work on the Augusta Street home—receipts that appellant claimed were the bases for the checks subsequently provided by Rob. Appellant claimed not to have seen Rob again after receiving the checks, except on the day before trial when he neither mentioned his charges nor sought the return of his receipts or other assistance from Rob. From these facts and circumstances a rational trier of fact could have concluded that appellant obtained four checks that he knew were invalid and cashed them in an attempt to defraud the credit union. *See Commonwealth v. Hudson*, 265 Va. 505, 514 (2003) ("While no single piece of evidence may be sufficient, the 'combined force of many concurrent and related circumstances, each insufficient in itself, may lead a reasonable mind irresistibly to a conclusion.'" (quoting *Derr v. Commonwealth*, 242 Va. 413, 425 (1991))). A rational trier of fact could also have concluded that appellant's account of how he received the checks lacked credibility and that it was an attempt to conceal his guilt of fraudulent intent. *See Covil v. Commonwealth*, 268 Va. 692, 696 (2004) ("A false or evasive account is a circumstance . . . that a fact-finder may properly consider as evidence of guilty knowledge.").

- 9 -

The facts and circumstances discussed above also fail to provide support for appellant's hypothesis of innocence. It is true that "[w]hen facts are equally susceptible to more than one interpretation, one of which is consistent with the innocence of the accused, the trier of fact cannot arbitrarily adopt an inculpatory interpretation." *Case v. Commonwealth*, 63 Va. App. 14, 23 (2014) (quoting *Moody v. Commonwealth*, 28 Va. App. 702, 706 (1998)). "However, the Commonwealth need only exclude reasonable hypotheses of innocence that flow from the evidence, not those that spring from the imagination of the defendant." *Id.* (quoting *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004)). Moreover, "determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify," *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015), and "[i]n its role of judging witness credibility, the fact finder is entitled to disbelieve the self-serving testimony of the accused and to conclude that the accused is lying to conceal his guilt," *Flanagan v. Commonwealth*, 58 Va. App. 681, 702 (2011) (quoting *Marable v. Commonwealth*, 27 Va. App. 505, 509-10 (1998)). In this case, the trial court rejected appellant's purportedly exonerative testimony as offering a "preposterous" account of events, and the record supports that determination.

Because the facts and circumstances of this case do not support appellant's hypothesis of innocence but do support the trial court's finding that appellant intended to defraud the credit union when he cashed "Bernie's" checks, we find no error in appellant's conviction for obtaining money by false pretenses.

### B. The Single Larceny Doctrine

Appellant argues that the trial court erred in convicting him of more than one count of obtaining money by false pretenses, when it should have dismissed three of the four indictments under the single larceny doctrine.

"A series of larcenous acts will be considered a single count of larceny if they 'are done pursuant to a single impulse and in execution of a general fraudulent scheme.'" *Acey v. Commonwealth*, 29 Va. App. 240, 247 (1999) (quoting *West v. Commonwealth*, 125 Va. 747, 754 (1919)). "The circumstances to be considered that will bear upon the issue are the location of the items stolen, the lapse of time between their taking, the general and specific intent of the thief, the number of owners, and whether intervening events occurred between the takings." *Richardson v. Commonwealth*, 25 Va. App. 491, 497 (1997). "The primary factor to be considered is the intent of the thief." *Bragg v. Commonwealth*, 42 Va. App. 607, 612 (2004) (quoting *Acey*, 29 Va. App. at 247). "[M]ultiple unlawful takings constitute separate larcenies if the thief acted upon a separate intent or impulse for each theft." *Millard v. Commonwealth*, 34 Va. App. 202, 207 (2000). "The overriding principle behind the single larceny doctrine is to prevent the state from aggregating multiple criminal penalties for a single criminal act." *Id.* at 206 (quoting *Richardson*, 25 Va. App. at 496).

In *Millard*, the defendant cashed three separate checks at the same bank on the same day and received the sum of all three checks in the aggregate from the same bank teller. *Id.* at 204. On these facts, this Court concluded that the defendant's actions were accomplished "pursuant to a single impulse and in execution of a general fraudulent scheme." *Id.* at 207. We remanded the defendant's case to the trial court to set aside two of the three convictions and sentences for obtaining money by false pretenses. *Id.* at 207-08.

In *Moore v. Commonwealth*, 59 Va. App. 795 (2012), this Court affirmed the defendant's conviction for three separate counts of obtaining money by false pretenses, where she deposited three separate money orders in the bank on the same day and at the same time, but withdrew the funds on three separate, consecutive days. This Court reasoned that the defendant's "sporadic

withdrawal pattern" was "evidence that she acted under 'a series of single impulses.'" *Id.* at 806-07 (quoting *Bragg*, 42 Va. App. at 614).

In the instant case, appellant cashed four checks in four transactions on four separate days. He divided these transactions between two different branch locations of his credit union over a six-day span. Thus, the facts here are more congruent with the facts of *Moore* than of *Millard*; that is, appellant engaged in a series of fraudulent transactions that were sporadic in both time and place, thus evidencing that he acted under a series of separate impulses. Accordingly, we reject appellant's argument that the trial court erred by failing to apply the single larceny doctrine to the facts of his case.

### III. CONCLUSION

For the foregoing reasons, we conclude that the evidence was sufficient to prove that appellant had the intent to defraud when he cashed four checks at his credit union. The trial court also did not err in finding that the single larceny doctrine does not apply to the facts of this case and that appellant committed four separate acts of obtaining money by false pretenses. Accordingly, we affirm appellant's convictions.

*Affirmed.*